IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| BRIDGETTE IRENE MINTON, | ) | |
| Individually and as next of kin | ) | |
| and Administrator of the | ) | |
| Estate of William Jeffrey Minton | ) | Civil Action File No. |
| | ) | |
| Plaintiff, | ) | |
| | ) | _____ |
| vs. | ) | JURY TRIAL DEMANDED |
| | ) | |
| WILLIAM BRADLEY, individually, | ) | |
| JARVIS CULVER, individually, | ) | |
| KATHERINE ELIZABETH EUBANKS, | ) | |
| individually | ) | |
| and JOHN/JANE DOES NOS. 1-6, | ) | |
| | ) | |
| Defendants. | ) | |

## **COMPLAINT FOR DAMAGES**

William Jeffrey Minton died of a herniated bowel obstruction while incarcerated. This lawsuit is filed on behalf of Mr. Minton's estate and his daughter and next of kin, Bridgette Irene Minton, under 42 U.S.C. §1983 and Georgia law.

## **PARTIES**

1.    Bridgette Irene Minton (hereinafter sometimes "Ms. Minton") is the daughter of William Jeffrey Minton (hereinafter sometimes "Mr. Minton") and files

this Complaint as next of kin for claims arising from the death of her father, and, as Administrator of the Estate of William Jeffrey Minton.

2.     The estate sues to recover damages for the pain and suffering Mr. Minton experienced prior to his death.

3.     Ms. Minton sues to recover the full value of the life of William Jeffrey Minton.

4.     Ms. Minton is a resident of the State of Georgia and is over the age of eighteen.

5.     At the time of his death, William Jeffrey Minton (hereinafter sometimes "Minton" or "the deceased") was an inmate at the Baldwin County Jail located in Milledgeville, Georgia.

6.     Mr. Minton was born on July 17, 1978 and was 39 years old at the time of his death. He died on July 28, 2018, while in the custody and care of the Baldwin County Sheriff's Department.

7.     The Baldwin County Sheriff's Office is a state certified agency with its principal office located at 119 Old Monticello Rd., NW, Milledgeville, GA 31062, and, among other responsibilities, is responsible for the Baldwin County jail.

8.     At all times relevant hereto, William Bradley (hereinafter sometimes "Cpl. Bradley") was a Corporal with the Baldwin County Sheriff's Department and, among other duties, was responsible to perform supervision of inmates and to

oversee and check the status of inmates of the Baldwin County jail, including, on July 27, 2018, William Jeffrey Minton.

9.   At all times relevant hereto, Lt. Jarvis Culver (hereinafter sometimes "Lt. Culver") was the Jail Administrator of the Baldwin County Sheriff's Department and, among other duties, was responsible to oversee the daily operations of the Baldwin County jail, supervise all jail staff and was responsible for the care, custody and security of the people in the jail. Among his essential duties, Lt. Culver was to ensure staff, including Bradley and others received appropriate training and were properly supervised and that the Sheriff's Department standard operating procedures were complied with in the operation of the jail and care for inmates.

10.   At all times relevant hereto, John/Jane Does Nos. 1-3 were Deputy Sheriffs, jailers, or other individuals employed by the Baldwin County Sheriff's Office who were in control of and charged with a duty and responsibility to oversee the Baldwin County jail and its inmates, including William Jeffrey Minton and his safety and wellbeing.

11.   Katherine Elizabeth Eubanks (hereinafter sometimes "Nurse Eubanks" or "Eubanks") was a registered nurse with at least 23 years of nursing experience.

12. At all times relevant hereto Eubanks was employed by CorrCare, Inc. as a nurse, at all times material to this action.

13. Eubanks was working on July 27, 2018.

14. At all times relevant hereto, John/Jane Does Nos. 4-6 were individuals employed or contracted to perform medical services at the Baldwin County Sheriff's Office and were charged with a duty and responsibility to oversee the medical needs of Baldwin County jail inmates, including William Jeffrey Minton.

15. All Defendants can be properly served at their place of residence inside this District or elsewhere where they may be found in this jurisdiction.

16. John/Jane Does Nos. 1-6 may be properly served in this action by delivering a Complaint and Summons to each as they are identified, and his/her address or wherever else they may be found in the jurisdiction.

## JURISDICTION AND VENUE

17. This Court has jurisdiction of this case pursuant to the provisions of 28 U.S.C. §1331; 28 U.S.C. §1343; 28 U.S.C. §1367; 42 U.S.C. §1983; and 42 U.S.C. §1988.

18. Upon service of process, this Court acquires personal jurisdiction over the Defendants, pursuant to Fed. R. Civ. P. 4(k))1)(a).

19.  Venue is proper in this Court because the conduct of the Defendants which forms the basis of this Complaint occurred in the Middle District of Georgia.

## CONDITIONS PRECEDENT

20.  On January 29, 2019, Counsel for Plaintiff, pursuant to O.C.G.A. §36-33-5, served Defendant Sheriff Massee, Baldwin County Sheriff's Department, the Baldwin County Board of Commissioners and Baldwin County manager Carlos Tobar with an *ante litem* notice via certified mail, setting forth each of Plaintiff's claims.  (A copy of the *ante litem* notice is attached as Exhibit "A" – Ante Litem Notice.)

21.  The *ante litem* notice was received by Defendant Sheriff Massee, Baldwin County Sheriff's Department, the Baldwin County Board of Commissioners and Baldwin County Manager, Carlos Tobar. (A copy of the receipts for the *ante litem* notice are attached hereto as Plaintiff's Exhibit "B" – Receipts of Service.)

22.  A copy of the *ante litem* notice and claim was sent to ACCG.

23.  Plaintiff has complied with all requirements of O.C.G.A. §36-33-5.

24.  Jurisdiction and venue in this Court are proper as to all parties.

## FACTUAL ALLEGATIONS

25.     On March 28, 2018, Mr. Minton went to the hospital for abdominal pain, at which time he was diagnosed with a hiatal hernia, and intestinal blockages. Surgery was recommended.

26.     On March 29, 2018, Mr. Minton underwent surgery at WellStar Spalding Regional Hospital.   Pre and postoperative diagnoses were small bowel obstruction.

27.     On April 4, 2018, Mr. Minton was discharged from the hospital and told to return for follow-up care and related care instructions for his gastrointestinal condition.

28.     On May 7, 2018, Mr. Minton was arrested and incarcerated at the Baldwin County jail in Milledgeville, Georgia.

29.     At all times until his death in the Baldwin County jail, Mr. Minton was under the custody, control, supervision and care of the Baldwin County Sheriff's Office ("BCSO") and its deputies, jailers, agents and jail medical staff, including Defendants and John/Jane Does Nos. 1-6.

30.     Mr. Minton died in the early morning hours of July 28, 2018.

31.     On May 7, 2018, BCSO performed an intake medical assessment.

32.   During the intake medical assessment, Mr. Minton informed BCSO staff that, six weeks prior to his incarceration, he had gastrointestinal surgery, during which part of his colon was removed.

33.   As a result of the report of recent surgery, BCSO staff requested and obtained Mr. Minton's medical records confirming the seriousness of his medical condition.

34.   At all times relevant hereto, BCSO, including Defendants Cpl. Bradley, Nurse Eubanks and John/Jane Does Nos. 1-6 were aware of Mr. Minton's ongoing medical condition.

35.   On May 25, Mr. Minton was sent by BCSO staff to the emergency room at Oconee Regional Medical Center (hereinafter sometimes "ORMC") due to severe abdominal pain and noticeable swelling and distention, as well increasing pain and associated nausea and vomiting, during which time an intestinal hernia was found in his genital region.

36.   Upon discharge, Mr. Minton and BCSO staff were given discharge instructions applicable to Mr. Minton's ongoing care.

37.   On June 26, 2018, Mr. Minton was seen at BCSO by BCSO medical personnel working at the BCSO jail facility  for swelling becoming worse around the

surgical site and increased pain, at which time, he was diagnosed with a ventral, incisional hernia by BCSO's Dr. Paul Buczynsky.

38. On July 2, 2018, Mr. Minton was moved from a regular cell to the medical "Bull Pen" due to noticeable enlargement of the diagnosed hernia.

39. Dr. Paul S. Buczynsky directed that Mr. Minton was to follow up with a general surgeon.

40. Mr. Minton was unable, due to his incarceration, to follow up with a general surgeon and BCSO's failure to provide or accommodate Minton's follow up directions, therefore, there was no follow up of medical orders from BCSO's own doctor.

41. Mr. Minton complained for several days of severe pain and, according to Mr. Minton's cellmate, Julius Butts, Mr. Minton was coughing up a dark-colored substance that Butts thought was blood.

42. After several days, Mr. Minton was finally taken to Navicent Health (hereinafter sometimes "Navicent") an acute care hospital facility in Milledgeville, Georgia.

43. On July 20, 2018, Minton presented at Navicent Health with severe abdominal pain, nausea and vomiting.

44.    After examination and treatment at Navicent, Mr. Minton was treated and
       released with specific instructions indicating he (Mr. Minton) was "stable for
       d/c back to prison with ***strict ED return precautions for any worsening
       abdominal pain, fever, or complication",*** *and to* ***"Return to Emergency
       Department with any worsening condition or concern…".*** (*See* Exhibit "C"
       – Navicent Discharge Summary & Directions (*emphasis added*).

45.    BCSO Policy 6.9, Hospitalized Inmates (See Exhibit "D"), in effect at all
       times relevant to this action, in relevant part, states:

       II.    PROCEDURES

                                        …

              F. Continued treatment of the inmate is to be provided in
                 accordance with the designated physician's instructions.

46.    After returning from Navicent, on July 20, 2018, Mr. Minton was placed in
       Medical Isolation and. According to BCSO's own documents, was supposed
       to be closely monitored.

47.    During his first night in isolation at the BCSO jail Mr. Minton began vomiting
       and complaining of increased abdominal pain and asking for medication.

48.    Despite the worsening abdominal pain and complication of nausea and
       vomiting, Mr. Minton was not returned to the Emergency Department, as
       clearly directed by doctors and staff at Navicent and BCSO Policy 6.9.

49.     On July 24, 2018, BCSO doctor (Dr. Buczynsky) examined Minton, reviewed his medical records, and ordered that Minton be on a liquid diet.

50.     On July 25, 2019, Mr. Minton was cleared to return to Baldwin County jail's general population area, despite ongoing abdominal pain.

51.     On July 26, 2018, Mr. Minton was again complaining about increasing abdominal pain which complaints were heard by a number of cell mates including Robert Faulk, Clarence Burney, Ansuan Lewis, Julius Butts, Ronald Lee Kirkland, Richard Sholar, Emerson Davis, Leroy Thomas and John Mosley who made Mr. Minton's pleas known to jailers.

52.     Mr. Minton, Julius Butts and other inmates called for help, as Mr. Minton was again coughing up dark, thick liquid.

53.     At or about 6:00 p.m. rather than taking him back to the Navicent ER, as directed by doctors, or given any other emergency medical care, as required by BCSO Policy 6.9, Mr. Minton was transferred back into Medical Isolation.

54.     During the morning hours of July 27, 2018, Mr. Minton complained to BCSO jailers that he had "passed out" earlier and had not had anything to eat or drink. This information was shared with the BCSO medical staff.

55.   Rather than return Mr. Minton to the hospital, he remained on a full-liquid diet in medical isolation, where, according to Nurse Eubanks, Mr. Minton "required observation every thirty minutes by the jailers." (See Exhibit "E")

56.   During the day, Mr. Minton's condition did not improve but, in fact, worsened.

57.   According to BCSO Medical Isolation Check sheet, at 12:30 p.m., Mr. Minton was lying on his bed in pain asking for the nurse.

58.   Neither a nurse nor any qualified medical staff person ever came to check on Mr. Minton, despite Nurse Eubanks reporting to the GBI that she spoke with BCSO doctor, presumably Dr. Buczynsky, at approximately 12:20 p.m. and later at 2:50 p.m.

59.   In Eubanks' recorded interview with GBI Special Agent David Peebles, taken just three hours after Mr. Minton was found dead, Nurse Eubanks said she had spoken with Dr. Buczynsky about Mr. Minton at 12:20 p.m. and 2:50 p.m.

60.   No records were ever produced by BCSO or anyone else indicating that Nurse Eubanks ever spoke with Dr. Buczynsky, or any other doctor, about Mr. Minton on July 27, 2018.[1]

---

[1]  Plaintiff repeatedly asked for all investigation of Mr. Minton's death and his medical records at the jail. In the production finally handed over, no medical records for July 27, 2018, the date of Mr. Minton's death, indicate that any BCSO

61.  The Baldwin County Medical Isolation Check sheet indicates that at 1:30 p.m. Mr. Minton is "throwing up everywhere." However, nothing was done, and Mr. Minton was not returned to the hospital, as directed by ER doctors or BCSO Policy 6.9.

62.  At 2:30 p.m. the Medical Isolation Check sheet states Nurse Eubanks checked on Mr. Minton.

63.  Video recording show that, at approximately 2:30 in the afternoon, BCSO staff, including Nurse Eubanks, another nurse believed to be Nurse Valerie Harper and others, go into the medical isolation cell where Mr. Minton was held.

64.  Medical and other jail staff found that Mr. Minton had vomited all over his cell and himself but was not returned to the hospital.

65.  BCSO staff, including nurses, left Mr. Minton and locked the cell door, leaving Mr. Minton in his cell with the vomit everywhere.

66.  Nurse Eubanks told the GBI that she saw yellow liquid on the floor consistent with vomit;  nevertheless, no further care was provided to Mr. Minton.

---

staff (medical or otherwise) ever contacted any doctor regarding Mr. Minton's condition (though records for other dates prior to his death were produced).

67.  Approximately thirty (30) minutes later, at approximately 3:02 p.m., Mr.
     Minton was moved from one medical isolation cell (M5) to another (M4) and
     was finally given a rag to wipe himself off.

68.  Mr. Minton had vomited so badly that BSCO staff had to have a someone mop
     out and remove soiled items from the cell.

69.  Cleaning the cell from the vomit took from approximately 3:08 p.m. until 3:24
     p.m. to complete.

70.  While the cell was being cleaned, at approximately 3:12 p.m., Nurse Eubanks
     and what appears to be another nurse in fuchsia scrubs leave the medical office
     and return 12 minutes later (with what appears to be food) and reenter the
     medical office immediately adjacent to the isolation ward.

71.  Video recordings show that neither Nurse Eubanks nor any other medical staff
     checked on Mr. Minton before his death, despite the fact there was an obvious
     threat of serious medical harm due to his deteriorating condition of which she
     and other BCSO staff were aware of for days.

72.  In her statement to the GBI, Nurse Eubanks, states that, at 4:15 p.m., she
     checked Mr. Minton's vital signs, while Mr. Minton was still obviously very
     ill (vomiting and nauseated), and that Mr. Minton wasn't complaining about
     pain and "his skin color was good."  (Exhibit E.)

73.    Nurse Eubanks did not check on Mr. Minton at or around 4:15 p.m., therefore, she could not have made such observations, as described above.[2]

74.    Nurse Eubanks and others (including John/Jane Does 1-6) ignored the direction of hospital doctors and staff and discharge instructions: *"strict ED return precautions for any worsening abdominal pain, fever, or complication", and to "Return to Emergency Department with any worsening condition or concern…"* (see Exhibit "C") and left the jail, leaving Mr. Minton to die in agony during the following eight hours.

75.    Nurse Eubanks, Cpl. Bradley and others (including John/Jane Does 1-6) ignored BCSO Policy 6.9 and failed to get Mr. Minton emergency medical care.

76.    No doctor or outside, qualified medical personnel, such as EMTs or fire rescue, were summoned to check on Mr. Minton, despite his obviously worsening state and the immediate significant risk of serious physical harm.

---

[2]  According to video recordings of the medical isolation ward provided by BCSO, Nurse Eubanks did not check on Mr. Minton as she told the GBI the next morning. The Medical Isolation Check sheet used by jailers also does not reflect Nurse Eubanks or any other medical staff checked Mr. Minton at or anywhere near 4:15 p.m. The check sheet shows no medical staff came to Mr. Minton's aid after 2:30 p.m. on July 27, 2018. (*See* Exhibit "G" – BCSO Medical Isolation Check sheet BCSO022 – BCSO024)

77.   Nurse Eubanks' statement to the GBI was that policy and circumstances "required observation every thirty minutes."

78.   BSCO medical operating procedures required Nurse Eubanks, under the circumstances and conditions described above, to contact a doctor or other medical professional if an inmate's symptoms worsened.

79.   Upon information and belief, BCSO medical operating procedures required Nurse Eubanks, under the circumstances and conditions described above, to note doctor's directives and pass them on to jailers and other staff for use in monitoring inmates in medical isolation.

80.   Nurse Eubanks failed to follow proper procedures regarding the care of Mr. Minton.

81.   Nurse Eubanks lied about checking on Mr. Minton in records and in her interview with the GBI.

82.   Had Nurse Eubanks followed policies, Mr. Minton would have survived.

83.   According to jail records, at 6:36 p.m., Mr. Minton said he was cold and asked Cpl. Bradley for a blanket.

84.   Cpl. Bradley finally gave Mr. Minton a blanket an hour later.[3]

---

[3] Shivering and requesting a blanket, further indication of complication of his medical condition, as noted in Navicent discharge instructions given to BCSO staff

85.    BCSO Policy 2.5, Administrative Separation (See Exhibit "F"), in effect at all

times relevant to this action, in relevant part, states:

"PROCEDURES

A.    An inmate should be placed in administrative separation when
       he/she:
                                    …
       5.       Requires medical isolation.

B.    Assignment to administrative separation is to be made by the Jail
       Administrator or designee.

C.    When a person is assigned to administrative separation, the Jail
       Administrator or designee is to keep on file a report detailing the
       reasons or basis for the assignment which may include:
       2.       Recommendation from a physician or nurse
                                    …
       5.       Information indicating the need for administrative
       separation is
                 discovered during the classification process.
                                    …
F.    The detention staff is to conduct in-person direct supervision of
inmates in administrative separation at irregularly scheduled intervals
not to exceed thirty (30) minutes.
                                    …
I.    Reports are to be maintained to record the following information
       about inmates held in administrative separation:
       1.       All admissions including the date, reasons, and who
                 authorized the separation:
       2.       Staff and officials visiting inmates with the date and time
                 of the visits
                                    …

---

– "*strict ED return precautions for any worsening abdominal pain, __fever__, or
complication*" *See* Exhibit C.

       * The medical isolation/check sheets will include the top (3) including when checks were made, by what officer, and are maintained for each individual currently on suicide watch. Anytime someone is placed in medical isolation, the county jail doctor will be notified immediately, and appraised of the condition of the person being placed in medical isolation. Jail staff will then document in the booking jail log book that the doctor was notified, the time and date, and what the doctor advised."

86. Despite non-discretionary procedures requiring that Mr. Minton, and all inmates confined to Administrative Separation, including separation in the medical isolation unit, be individually checked and observed "**<u>at irregular scheduled intervals not to exceed thirty (30) minutes</u>**" by BCSO jailers, on the evening of July 27, 2018 and early on July 28, 2018, BCSO staff, including Cpl. Bradley and others, and including John/Jane Does 1-6, failed to follow this non-discretionary procedure.

87. According to check sheets and admissions by Cpl. Bradley to GBI SA Peebles, Mr. Minton, was "checked on at approximately 10:47 p.m." on July 27, 2018 and again not until approximately **ninety-six (96) minutes later** at 12:43 a.m. on the morning of July 28, 2018, (*See* Exhibit "H" – Bradley Statement to GBI.[4])

---

[4]  While Cpl. Bradley indicated he checked Mr. Minton at 10:47 p.m., Grady Patient Care report indicates BCSO staff told them Mr. Moore was last checked and found well at 10:12 (2212). (*See* Exhibit "I" – Grady Patient Care Report.)

88.   Cpl. Bradley told SA Peebles that policy "requires staff checks periodically (every 30 minutes) to make sure that each inmate was responsive/alive." (See Exhibit "H".)

89.   Cpl. Bradley's 2247 (10:47 p.m.) entry on the medical isolation check sheet indicates Mr. Minton was "on bed making noise."  Cpl. Bradley did nothing to aid or seek aid for Mr. Minton.

90.   The medical isolation check sheet was seen by Cpl. Bradley and others who were supposed to be checking on Mr. Minton on July 27, 2018.

91.   The medical isolation check sheet, posted outside Mr. Minton's cell, clearly indicated that Mr. Minton had been: "throwing up everywhere"; asking for medical assistance; seen by medical staff (nurses); stating his stomach hurts; was constipated; and, was cold, among other entries.

92.   Bradley and other BCSO staff, including John/Jane Does 1-3 were fully aware Mr. Minton was critically ill that evening.

93.   BCSO SOP requires checking inmates in medical isolation, at irregular intervals, not to exceed every thirty minutes.

94.   BCSO Policy 5.5, Emergency Medical Services (See Exhibit "O-1")[5], in effect at all times relevant to this action, in relevant part, states:

---

[5] See also Exhibit O-2, BCSO Policy 5.4, Non-Emergency Medical Services.

"PROCEDURES

    A. In the event a staff member discovers an inmate or staff member who is in need of emergency medical attention, he/she is to immediately notify the shift OIC or nearest medical help of the situation and his location.

    B. The detention staff is to summons [sic] appropriate assistance to the area including emergency medical personnel and detention staff.

…

    E. In the event the injured person is an inmate, and it is determined upon examination that he/she needs to be transported to the hospital, the detention staff is to ensure he/she is transported and supervised in accordance with Policy 6.9"

95.    On the evening of July 27, 2018 and the early hours of July 28, 2018, Cpl. Bradley and John/Jane Does 1-3 had ample opportunity and time to perform all required checks.

96.    Cpl. Bradley and John/Jane Does 1-3 had ample opportunity and time to summon medical assistance for Mr. Minton, as required by BCSO operating procedures.

97.    Cpl. Bradley checked on Mr. Minton at the following times, according to video evidence (the times are provided in military 24-hour format as found on the BCSO video recordings).

1822        Food tray given, Bradley notes sheet

| | |
|---|---|
| 1842 | Bradley checks sheet (Minton askes for blanket – cold) |
| 1915 | 33 mins after initial/last check |
| 1933 | 18 mins later |
| 2006 | 33 mins later |
| 2044 | 41 mins later |
| 2051 | 8 mins later. Looks in, looks at watch but did not annotate |
| 2052 | 1 min later. Checks Minton |
| 2114 | 23 mins later |
| 2120 | 6 mins later |
| 2132 | 12 mins later (another BCSO staff member, looks in but does not annotate – hands Minton blanket) |
| 2140 | 8 mins later (another BCSO staff member looks in but does not annotate) |
| 2154 | 14 mins later |
| 2219 | 25 mins later |
| 2222 | 3 mins later (BCSO staff, believed to be Grissom, glances in and walks away, returns few seconds later and again walks away – no help given) |
| 2232 | 10 mins later. Another BCSO staff member messes with window, no check on Minton |
| 2233 | 11 mins later. Another BCSO staff member cracks window, no check on Minton |

2236        3 mins later, Bradley notes check but does not actually check

2254        18 mins later, Bradley checks Minton

2312        Bradley adds paper to clipboard, writes something but does not check

0003        69 mins later, Bradley fiddling with window, but does not actually open or check on Minton

0026        **92 mins after actual last check on Minton**. Bradley looks for about 15 secs and finally opens door, apparently to check on Minton – found unresponsive

0029        3 mins later, Bradley returns with another BCSO employee, believed to be Jailer Quistan Grissom, who leaves quickly

0032        Grissom returns with another guard

0035        Police arrive and enter cell

0040        14 mins after Minton is found unresponsive, EMS arrives.[6]

98.   Cpl. Bradley falsified the medical isolation check sheets and indicated checks were performed when they were not.

99.   A fellow inmate, Willis Rozier, told the GBI that, at approximately 10:00 p.m. he heard Mr. Minton moaning and "hollering out" or crying for help,

---

[6]   Cpl. Bradley checked on Mr. Minton at the times above; however, Cpl. Bradley noted on the medical isolation check sheet (See Exhibit "G") that he checked Mr. Minton at least two more times than he actually did. The log/sheet was falsified. (NOTE: It appears the video time stamps and Cpl. Bradley's watch/check sheet annotations are approximately 7 minutes off from sync.)

informing BCSO jail personnel that Mr. Minton was hurt and in need of medical attention. (*See* Exhibit "J" – Rozier Statement to GBI.)

100. According to witnesses, BCSO log sheets and video evidence, no one responded to Mr. Minton's cries for help, despite the fact BCSO jail staff knew about his critical medical condition.

101. At approximately 10:00 p.m., another, yet to be identified, inmate who was in the booking area heard screams and moans coming from the medical isolation dorm.[7]

102. The yet to be identified inmate, stated that he was eventually moved from booking to a holding cell.

103. Sometime later (after Minton was found dead), this yet to be identified inmate saw BCSO staff and others going into Mr. Minton's cell, the cell from which the witness had heard the "screams & yelling coming from"

104. Another inmate, Codie Brown, told the GBI that he heard "officers say something about someone bleeding in a cell around midnight or after."

---

[7] This inmate reports he was in a restraint chair at time of Minton's cries for help. He can be seen in the chair on Deputy King's body-cam footage at 12:40 a.m. or one minute and 25 seconds into the body cam.

105.  The BCSO jail staff would have seen Mr. Minton bleeding and in obvious need of immediate medical assistance, if procedures had been followed and checks had been performed.

106.  Minton's condition and pleas for medical attention were ignored by his custodians. (*See* Exhibit "J"– Inmate Witness Statement; *see also* BCSO Policy 2.5, Administrative Separation *supra*.)

107.  Emergency medical service (EMS) personnel were summoned to the Baldwin County jail at approximately 12:30 a.m. on July 28, 2018 and arrived at the jail at approximately 12:40 a.m.

108.  Unfortunately, the summoning and arrival of medical personnel was too late to help or save Mr. Minton from his untimely and unnecessary death.

109.  EMS determined that Mr. Minton was deceased prior to their arrival and observed that Mr. Minton had been moved from the floor to the bed in the cell.

110.  EMS indicated that Mr. Minton had to have been dead for some time, because his body was cold, and rigor had already set in.[8]  (*See* Exhibit "I")

---

[8]  Grady EMS Patient Care Record states that Mr. Minton was found "cold" and "cyanotic."

111.  BCSO Officer King's body-cam footage 2:30 into the recording, EMTs state "he's been down a while. He's already turning blue."

112.  The EMS report states that Mr. Minton's clothes had been removed, his head exhibited "Drainage, Facial Droop, Mass, Swelling" and a blocked airway. (*See* Exhibit "I")

113.  GBI photographs taken of Mr. Minton and the cell where Mr. Minton was found reflected the condition of Mr. Minton's cell and his body, as indicated in Grady EMS's report.

114.  GBI photographs show there was blood on numerous places on the floor, Mr. Minton's head, mouth, and, clothing and bed sheets (which had been removed before EMS arrived).

115.  EMS personnel, arriving at approximately 12:40 a.m., examined Mr. Minton, determining he was already dead.

116.  EMS personnel left the Baldwin County jail at approximately 12:46 a.m.

117.  Minton was pronounced dead at 1:08 a.m. on July 28, 2018 by Deputy Coroner William K. Garland.

118.  According to the death certificate signed by Garland, the immediate cause of death of Mr. Minton death was: (a) small bowel perforation; (b) due to or as a consequence of small bowel obstruction by fibrotic band; (c) due to or as a

consequence of right hemicolectomy for probable cecal bascule. (See Exhibit "K")

119.   The final diagnosis of Melissa Sims-Stanley, MD, Regional Medical Examiner, Georgia Bureau of Investigation Division of Forensic Sciences, indicated:

a.   Peritonitis; supperlative [sic] peritoneal fluid (450 ml); dull serosal surfaces of the abdominal viscera.

b.   Small bowel perforation (1.5 cm) immediately proximal to fibrotic band.

c.   Small bowel obstruction by fibrotic band (less than 0.2 cm in width) with associated adhesions encircling 70 cm in length segment of small bowel and mesentery with microscopic findings consistent with strangulation.

d.   Medically documented, remote right hemicolectomy (3/28/18): due to small bowel obstruction and probable cecal bascule.

e.   Cardiomegaly (480 grams; expected heart weight based on height = 348 +/- 40 grams).

f.   Chronic obstructive pulmonary disease: apical pulmonary bullae; increased anthracotic pigment within the plural lymphatics.

g.  Hepatomegaly (1.76 grams).

h.  Blunt force trauma: facial and extremity abrasions, contusions and scabs; right temporalis musculature hemorrhages.

i.  Peripheral blood hydroxyzine level = lower than lowest calibrator of 0.05 mg/L (therapeutic).

(See Exhibit "L")

120.  If BCSO standard operating procedures had been followed by jail staff, including Cpl. Bradley and others, including John/Jane Does 1-6, they would have found Mr. Minton in medical isolation cell M4, on the floor, bleeding profusely, with a noticeable injury to his head and having vomited yet again, which any person, with or without any specialized medical training, would know required immediate medical care.

121.  BCSO staff did not find Mr. Minton because BCSO policies, in place for the very purpose of protecting those like Mr. Minton with the very real and known risk of immediate, significant physical harm were ignored.

122.  If Mr. Minton had received emergency medical assistance, he could have easily been given life-saving medical assistance and survived.

123.  If proper medical aid had been summoned at any point on the day of his death, it would have been readily apparent to any medical practitioner that, based on

Mr. Minton's appearance, symptoms, including the later gash on his head and profuse bleeding (even if Defendants had not known about ER discharge instructions).

124.   There was a regular pattern and practice by BCSO staff of failing to make required checks on inmates in medical isolation, and failure to provide adequate medical care to inmates which pattern was known by Lt. Culver and others, including John/Jane Does 1-3.

## COUNT I

### Violation of Ministerial Duties against Defendant Cpl. Bradley and John/Jane Does 1-3 under Georgia Law

125.   The duties and procedures described above, whereby these Defendants were required to perform health and safety checks on Mr. Minton on the evening of his death, constitute ministerial duties.

126.   The Defendants breached those duties by failing to perform the health and safety checks.

127.   As a direct and proximate result of the deliberate indifference of these Defendants Mr. Minton was wrongfully deprived of his life and endured great pain and suffering before his death.

## COUNT II

### VIOLATION OF MINISTERIAL DUTIES AGAINST
### KATHERINE ELIZABETH EUBANKS AND JOHN/JANE DOES 4-6

128.   The duties and procedures described above, whereby these Defendants were required to perform health and safety checks on Mr. Minton, constitute ministerial duties.

129.   The Defendants breached those duties by failing to perform the health and safety checks and provide care as required by standard operating procedures.

130.   As a direct and proximate result of the deliberate indifference of these Defendants Mr. Minton was wrongfully deprived of his life and endured great pain and suffering before his death.

## COUNT III

### DELIBERATE INDIFFERENCE UNDER 42 U.S.C. §1983 AGAINST
### CPL. BRADLEY & JOHN DOES 1-3

131.   Cpl. Bradley and John Does 1-3 owed a duty to secure and provide humane and adequate medical care for Mr. Minton where his need for emergency assessment and assistance was readily apparent.

132.   Cpl. Bradley and John/Jane Does 1-3 breached their duties associated with securing and providing humane and adequate medical care for Mr. Minton.

133. Cpl. Bradley and John/Jane Does 1-3 knew of and disregarded an apparent and known risk of serious medical harm to Mr. Minton's health, and were thereby deliberately indifferent to Mr. Minton's immediate need for medical attention and are thus liable, pursuant under both state and federal law for this deliberate indifference.

134. The conduct of Cpl. Bradley and John/Jane Does 1-3 exhibits a total disregard to Mr. Minton's constitutional right to be free from deliberate indifference to his need for medical care, founded upon the Eighth and Fourteenth Amendments to the United States Constitution and resulted in significant pain and suffering and the eventual death of Mr. Minton.

135. As a direct and proximate result of the deliberate indifference of these Defendants Mr. Minton was wrongfully deprived of his life and endured great pain and suffering before his death.

136. As discovery progresses, Plaintiff will amend the Complaint to name other parties liable to Plaintiff for their deliberate indifference.

## COUNT IV

### DELIBERATE INDIFFERENCE UNDER 42 U.S.C. §1983 AGAINST NURSE EUBANKS & JOHN/JANE DOES 4-6

137. These Defendants owed a duty to provide humane and reasonable medical care to Mr. Minton.

138.   These Defendants breached their duties associated with the provision of medical evaluation, medical treatment and nursing care to Mr. Minton.

139.   These Defendants knew of and disregarded an apparent and known risk of serious medical harm to Mr. Minton's health, and were thereby deliberately indifferent to Mr. Minton's immediate need for medical attention and are thus liable, pursuant under both state and federal law for this deliberate indifference.

140.   The conduct of these Defendants' exhibits a total disregard to Mr. Minton's constitutional right to be free from deliberate indifference to his need for medical care, founded upon the Eighth and Fourteenth Amendments to the United States Constitution and resulted in significant pain and suffering and the eventual death of Mr. Minton.

141.   As a direct and proximate result of the deliberate indifference of these Defendants Mr. Minton was wrongfully deprived of his life and endured great pain and suffering before his death.

## COUNT V

### MEDICAL NEGLIGENCE AGAINST NURSE EUBANKS

142.   Nurse Eubanks owned Mr. Minton the standard of medical care required of nurse providers.

143.   Nurse Eubanks breached the duty of care owed to Mr. Minton.

144.   The care provided by Nurse Eubanks amounted to no treatment at all, in light of the failure listed herein.

145.   Particularly, amongst other failures, Nurse Eubanks failed to meet the standard of care, in that:

    a.   Dr. Paul S. Buczynsky, the jail Medical Doctor, directed that Mr. Minton be checked every 30 minutes in the medical isolation unit, until he was seen by a medical doctor; however, Nurse Eubanks, along with other medical staff, failed to follow doctor's orders regarding Mr. Minton's care;

    b.   Nurse Eubanks failed to monitor Mr. Minton, according to her own documented plan which stated, in part, "Continue to monitor", but no further assessments were performed; and,

    c.   Nurse Eubanks failed to appropriately assess Mr. Minton regarding for his presenting complaints.

146.   Nurse Eubanks owed a duty to report to the on-call physician the changes in Mr. Minton's conditions.

147.   Nurse Eubanks provided markedly substandard nursing care to the medical needs of Mr. Minton.

148.   As a direct and proximate result of Nurse Eubanks' negligence, Mr. Minton was wrongfully deprived of his life and endured great pain and suffering before his death.

## COUNT VI

### SUPERVISORY LIABILITY UNDER 42 U.S.C. §1983 AGAINST LT. JARVIS CULVER

149.   BCSO Procedure 8.1 (See Exhibit "M") defines the Jail Administrator as: "Facility Administrator – the employee who is directly responsible for the daily operations of the Baldwin County Jail, also referred to as the Jail Administrator."

150.   BCSO Policy – Job Descriptions – Jail Administrator (See Exhibit "N"), in effect at all times relevant to this action, in relevant part, states (emphasis added):

"Job Title:   Jail Administrator

Summary:   ***Oversees the daily operations of the Baldwin County   Jail***. Directs and coordinates with personnel to achieve  departmental goals and objectives. ***Supervises all jail staff.*** Responsible for submission of annual budget recommendations. ***Responsible for care, custody, and security of the people in the jail.***

Essential  Duties  & Responsibilities include  the following: Other duties may be assigned.

***Make sure staff receive appropriate training.***

Maintains the jail SOP and keeps it up to date.

Makes sure entry level training is completed and new personnel receive items essential to his or her position."

151. At all times relevant hereto, Defendant Lt. Culver and others, including John/Jane Does 1-3, were responsible for overseeing the everyday operations of the jail.

152. As to matters of daily jail operation and training, Lt. Culver and others, including John/Jane Does 1-3, had final decision-making authority over the operation of the BCSO jail.

153. Lt. Culver and others, including John/Jane Does 1-3, were responsible for directing and coordinating BCSO jail personnel and supervise BCSO staff personnel.

154. Lt. Culver and others, including John/Jane Does 1-3, were responsible for ensuring BCSO staff were properly trained, in accordance with BCSO standard operating policies and procedures.

155. Lt. Culver and others, including John/Jane Does 1-3, failed to properly train jail staff as to how to properly monitor inmates in medical isolation, in accordance with BCSO jail policy.

156.   Lt. Culver and others, including John/Jane Does 1-3, with policy making authority were responsible for the care, custody, and security of inmates and others in the BCSO jail facility.

157.   Lt. Culver and others, including John/Jane Does 1-3, failed in his duty owed to Mr. Minton, in caring for and ensuring his safety.

158.   Lt. Culver and others, including John/Jane Does 1-3, were aware that jail staff, including Cpl. Bradley, were not following BCSO policies regarding checking on inmates in medical isolation cells.

159.   BCSO staff, including Cpl. Bradley regularly and repeatedly failed to properly check on the inmates in medical isolation and lied about doing so (or at best repeatedly failed to keep accurate records), as required by BCSO policy.

160.   These failures to care for and protect inmates, including Mr. Minton, were reflected on daily videos recorded inside the jail.

161.   Lt. Culver and others, including John/Jane Does 1-3, failed to review and supervise the conduct of jail staff, resulting in these ongoing failures.

162.   At all times relevant hereto, Lt. Culver and others, including John/Jane Does 1-3, were aware that BCSO jail staff, including Cpl. Bradley, were not following BCSO policies regarding providing supervision and medical attention to inmates, including Mr. Minton, and took no steps to adequately

and appropriately supervise staff, take corrective action, or provide or ensure proper training which would ensure the proper and appropriate care and security of inmates, including Mr. Minton.

163. Such widespread failure to follow policy and train and supervise BCSO jail staff, in accordance with BCSO policies and procedures, demonstrates the existence of an unwritten policy and practice of failing to check on and provide for the medical needs of inmates, including Mr. Minton.

164. As a direct and proximate result of Lt. Carver's negligence, Mr. Minton was wrongfully deprived of his life and endured great pain and suffering before his death.

## COUNT VII

## Punitive Damages Against All Defendants

165. The Defendants' acts, as set forth herein, were willful, wanton, malicious and so extreme and oppressive as to entitle Plaintiff to an award of punitive damages from the individual Defendants.

## COUNT VIII
## Attorney's Fees Against All Defendants

166. Plaintiff seeks attorney's fees against the Defendants, pursuant to O.C.G.A. §13-6-11, as Defendants have acted in bad faith, been stubbornly litigious and have cause the Plaintiff unnecessary trouble and expense.

167.  Plaintiff also seeks attorney's fees pursuant to 42 U.S.C. §1988 for her causes of action under 42 U.S.C. §1983.

## DAMAGES

168.  As a direct and proximate result of the actions and inactions of the Defendants, Mr. Minton suffered, and the Plaintiff is entitled to recover compensatory damages in an amount sufficient to compensate for the full value of the life of Jeffery Minton.

169.  As a direct and proximate result of the actions and inactions of the Defendants, the estate of William Jeffery Minton is entitled to recover any and all expenses of William Jeffery Minton's last medical condition resulting in his death, including funeral and other related expenses and for the extreme physical pain and emotional suffering Mr. Minton endured prior to his death.

**WHEREFORE,** Plaintiff having set forth her claims and demands, respectfully demands:

(a)   General damages as to all Defendants, jointly and/or individually, for William Jeffrey Minton's pre-death pain and suffering;

(b)   Special damages as to all Defendants for funeral and related costs associated with the death of William Jeffrey Minton;

(c)     Compensatory damages as to all Defendants for the full value of the life

         of William Jeffrey Minton;

(d)     Attorney's fees and costs against Defendants pursuant to Georgia and

         federal law;

(e)     Trial by jury; and,

(f)     For such other and further relief as this Court deems just and proper.

PLAINTIFF DEMANDS TRIAL BY JURY.

Respectfully submitted this 16th day of March 2020.

                                         ISENBERG & HEWITT, P.C.

                                         */s/ Melvin L Hewitt*
                                         Melvin L. Hewitt
                                         Georgia Bar No. 350319
                                         Hilary W. Hunter
                                         Georgia Bar No. 742696
                                         Mark B. Bullman
                                         Georgia Bar No. 094376

600 Embassy Row, Suite 150
Atlanta GA 30328
(770) 351-4400
mel@isenberg-hewitt.com
hilary@isenberg-hewitt.com
mark@isenberg-hewitt.com