IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| BRIDGETTE IRENE MINTON, et al., ) | |
| ) | Civil Action File No. |
| Plaintiffs, ) | |
| ) | 5:20-CV-00102-TES |
| vs. ) | |
| ) | |
| WILLIAM BRADLEY, et al. ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. JOHNNY EDWARD BATES**

Because Defendants CorrCare, Inc.'s and Dr. Paul Buczynsky's proffered expert medical witness, Dr. Johnny Edward Bates, is unqualified to give expert testimony in the areas of emergency medicine and life expectancies, has given testimony which lacks a reasonable degree of medical certainty, and has given testimony which lacks a proper factual basis or methodology, portions of his expert report and testimony do not satisfy the Federal Rule of Evidence 702. Therefore, Plaintiffs move the Court to exclude Dr. Bates opinion testimony, in part, pursuant to Rule 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993).

### STATEMENT OF MATERIAL FACTS

**A.     CorrCare, Inc. and Dr. Paul Buczynsky.**

Dr. Paul Buczynsky is a licensed physician that currently practices in Georgia. (Deposition of Paul Buczynsky, M.D. 8:10-14, 9:16-18, a copy is attached as Exhibit

A.) Dr. Buczynsky is the owner and employee of the company CorrCare, Inc., which provides physician services for people who are incarcerated in several Georgia county jails. (Buczynsky Dep. 21:4-16, 23:14-19.) CorrCare, Inc. currently provides services in six Georgia counties at seven facilities. (Buczynsky Dep. 20:12-21:3.) Mr. Minton was incarcerated at the Baldwin County Jail, which is one of the facilities that CorrCare, Inc. provides physician services. (Buczynsky Dep. 24:25-25-5.)

**B.      Mr. Minton's Medical Issues and Death in Custody.**

At all times relevant hereto, Mr. Minton was incarcerated at the Baldwin County jail in Milledgeville, Georgia. Throughout his time at Baldwin County Jail, Mr. Minton complained about severe stomach pain. (Deposition of Elizabeth Eubanks 98:18-100:6, 104:20-106:17, 107:19-108:7, 109:19-110:7, 114:15-115:15, 118:9-11, 136:10-17, 152:2-15, 150:25-151:13, a copy is attached as Exhibit B; Deposition of Crystal Bell 86:22-87:21, 95:14-19, a copy is attached as Exhibit C; Deposition of William Bradley 106:11-13, 111:5-20, a copy is attached as Exhibit D; Affidavit of Leonard Jones, a copy is attached as Exhibit E.) Mr. Minton had a history of prior abdominal surgery when he was booked into jail. (Eubanks Dep. 85:17-21.) His stomach pain and symptoms were so severe that he required hospitalization twice while he was incarcerated at Baldwin County Jail. (Bell Dep. 86:22-87:21, 95:14-19; Eubanks Dep. 98:18-100:6, 107:19-108:7, 150:25-151:13.)

Even after returning to jail from the hospital, Mr. Minton continued to complain about gastrointestinal issues and stomach pain. (Bradley Dep. 106:11-13, 111:5-20; Eubanks Dep. 114:15-115:15, 118:9-11, 136:10-17; Ex. E.) Early in the morning of July 28, 2018, William Minton died in in a medical isolation cell while incarcerated at the Baldwin County Jail in Milledgeville, Georgia. (Bradley Dep. 33:18-21.)

The Mintons filed Suit against Defendants, alleging, *inter alia*, that Dr. Buczynsky, and Nurses Harper, Bell, and Harrison failed to perform their duties to provide adequate medical care for Mr. Minton, which ultimately led to a preventable and painful death.

**C.     Dr. Bates as an Expert Witness.**

On June 15, 2021, Defendants identified Dr. Johnny Edwards Bates, in their pleading titled "First Supplement to Initial Disclosures of Defendants CorrCare, Inc. and Paul Buczynksy, M.D. Pursuant to Fed.R.Civ.P. Rule 26(a)(1)" as an expert witness to dispute the Minton's contentions that the Defendants breached duties owed to Mr. Minton and violated the standard of medical care owed to Mr. Minton while he was incarcerated. (A copy of First Supplement to Initial Disclosures of Defendants CorrCare, Inc. and Paul Buczynksy, M.D. Pursuant to Fed.R.Civ.P. Rule 26(a)(1) is attached as Exhibit F.)

Dr. Bates issued a report dated June 15, 2021 which was attached to the disclosure. (A copy of "Expert Witness Report of Johnny E. "Rusty" Bates MD, M

MM, CPE, CCHP, CCHP-P, CPHIMS" is attached as Exhibit G.) Dr. Bates is a licensed physician who practices medicine in Alabama, Tennessee, Mississippi, and Louisiana and has experience in correctional medicine and medical management. (Ex. G, p.5.)  He is a Certified Correctional Health Professional-Physician by the National Commission on Correctional Health Care and founded Quality Correctional Health Care, a company that provides inmate healthcare services at sixty-five jails in seven states. (Ex. G, pp.1,4-5.)

In his report, Dr. Bates gave six opinions. The two at issue here are numbers 5 and 6:

> 5. To a reasonable degree of medical probability, Mr. Minton's death was not caused by any act or omission by Dr. Buczynsky; prior to July 27th Mr. Minton had been sent twice to the local emergency department with similar complaints, he had been evaluated by the emergency physician and discharged back to the jail on both occasions, and by the time his condition suddenly worsened enough for anyone to recognize a surgical emergency on the evening of July 27, 2018, it is impossible to say with any reasonable degree of confidence that Mr. Minton would have survived the emergency surgery itself.
>
> 6. The use of methamphetamines, especially IV use, has been associated with an increased risk of multiple co-morbidities and a marked decrease in life expectancy.

(Ex. G, pp.2-3.)

Dr. Bates deposition was taken on June 22, 2021. (A copy of the transcript of the Deposition of Johnny Edwards Bates, M.D. is attached as Exhibit H.)  He is

currently employed as the founder of Quality Correctional Health Care which provides health care to inmates at various facilities (Bates Dep. 9:1-4; Ex. G, pp. 1, 5.)  He has not practiced emergency medicine in 12 years.  (Bates Dep. 80:20-22.) He is admittedly not a qualified expert as to emergency medicine. (Bates Dep. 18:9-15.)

## ARGUMENT AND CITATION OF AUTHORITY

**A.    Legal Standard for Admissibility of Expert Testimony**

The issues at bar in the Mintons' *Daubert* Motion are governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny.  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> **(b)** the testimony is based on sufficient facts or data;
> **(c)** the testimony is the product of reliable principles and methods; and
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  "The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence."  *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir.1999). The proffered expert testimony "must meet the

legal as well as the substantive issues of the case." *Id.* at 1320. "Rule 702 plainly contemplates that the district court will serve as a gatekeeper to the admission of scientific testimony." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340 (11th Cir. 2003). In fulfilling that gatekeeper role, the Court engages in a three-part inquiry. *Id.* at 1340-41.

First, the Court must consider whether the expert is qualified to testify competently regarding the matters he is addressing – often referred to as the "qualifications" requirement. *Id.* at 1340. An expert may be qualified to testify due to his knowledge, skill, experience, training, or education. *Trilink Saw Chain, LLC v. Blount, Inc.*, 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008).

Second, the Court must consider if the methodology by which the expert reaches his conclusions is sufficiently reliable – commonly called the "reliability" requirement. *Quiet Tech* at 1340. Lastly, the Court must address whether the testimony assists the trier of fact, through the application of his expertise, to understand the evidence or determine a fact in issue – the "relevance" or "fit" requirement. *Id.* "The Eleventh Circuit refers to these three considerations separately as "qualification, reliability, and helpfulness." *Hannah v. Armor Corr. Health Servs., Inc.*, 8:19-CV-596-TPB-SPF, 2021 WL 1777881, at *2 (M.D. Fla. Mar. 8, 2021). However, "[t]he Eleventh Circuit has cautioned that "[m]any factors will bear on the inquiry, and [there is no] definitive checklist or test." *Williams v.*

*Ideal Indus., Inc.*, 1:14-CV-02883-LMM, 2017 WL 3485764, at *3 (N.D. Ga. Mar. 7, 2017) (citations and quotations omitted).

When medical causation is at issue, parties must prove causation to a reasonable degree of medical certainty. *Siharath v. Sandoz Pharm. Corp.*, 131 F. Supp. 2d 1347, 1352 (N.D. Ga. 2001) (citations omitted), *aff'd sub nom. Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194 (11th Cir. 2002). More recently, the Northern District of Georgia echoed that "[u]nder Georgia law, medical causation must be proven to a reasonable degree of medical certainty and requires a showing of general and specific causation." *Nix v. Ethicon, Inc.*, 1:19-CV-04896-SCJ, 2020 WL 5525172, at *3 (N.D. Ga. Sept. 14, 2020).

In the instant matter, the Court should exercise its gatekeeping function and exclude opinions five and six of Dr. Bates' expert report because, as is shown *infra*, analysis reveals that he cannot withstand scrutiny under the qualification and reliability considerations.

B.   **Dr. Bates' Fifth Opinion Should be Excluded.**

   1.   **Bates' Fifth Opinion**

Dr. Bates' fifth opinion is:

> To a reasonable degree of medical probability, Mr. Minton's death was not caused by any act or omission by Dr. Buczynsky; prior to July 27th Mr. Minton had been sent twice to the local emergency department with similar complaints, he had been evaluated by the emergency physician and discharged back to the jail on both

> occasions, and by the time his condition suddenly worsened enough for anyone to recognize a surgical emergency on the evening of July 27, 2018, it is impossible to say with any reasonable degree of confidence that Mr. Minton would have survived the emergency surgery itself.

(Ex. G, p.2-3.)

In Dr. Bates' fifth opinion, he states that "…it is impossible to say with any reasonable degree of confidence that Mr. Minton would have survived the emergency surgery itself." (Ex. G, p.2-3.) He further states in his deposition testimony that he did not agree that Mr. Minton would have survived if he had been taken to the emergency room on the evening of July 27th, 2018, specifying that "there's no way I would bet that he would have survived at 9:15, or that he would survive even if he had been sent out even at 7 o'clock or earlier." (Bates Dep. 62:22-63:9.)  He opines, Mr. Minton's chances at having a successful surgery, testifying that "this would have been a major surgery in somebody who was already in a weakened condition. And I don't think there is any way he would survive." (Bates Dep. 63:17-20.)

### 2. Dr. Bates is unqualified to testify as to whether Mr. Minton would have survived surgery

Dr. Bates is unqualified to render expert opinion on whether Mr. Minton would have survived a surgery to repair his bowel.  Dr. Bates is a doctor who works in correctional medicine and managing a healthcare service.  (Bates Dep. 9:1-4; Ex.

G, pp.1, 5.)  When asked to define his areas of expertise, Dr. Bates admits, "I usually don't meet the qualifications…I haven't [worked in the emergency room] in quite some time, so, you know, I wouldn't qualify as an ER expert anymore.  But I do a lot of correctional work. So I think that's the only area." (Bates Dep. 18:9-15.)  He further explained that he last practiced emergency medicine "[p]robably 12 years ago." (Bates Dep. 80:20-22.)

However, both in the fifth opinion and in his deposition, Dr. Bates proffered expert testimony as to emergency medicine.

> Q. Okay. Supposing the call had been made to EMS on the night of Mr. Minton's death and EMTs had arrived within 10 minutes of the call, what would be the normal steps for a medical diagnosis and surgical intervention? Supposing that every medical person from that point on did everything correctly, what were the steps that you would think would have occurred?
> A. Well, they would have to evaluate and determine what was actually wrong with him. And this probably would have been even more difficult at this point because he was likely septic and had low blood pressure and would become more unresponsive. So getting the history out of him or talking to him, trying to elicit a history from him would have been next to impossible. So -- and, you know, he probably would not have been conscious enough to (inaudible) to elicit any kind of response there. So you would have a patient -- you would have to draw blood. You would have to probably take him into the CT scanner. And then once you realized that he had perforated, get him to the OR and then perform a surgical procedure, which in this case would have been difficult because of the adhesions that would have made it that much harder and his condition -- because he had been sick and had had

> previous surgery. So all of that combined would make him be -- his survival much less likely.
> Q. And that's even if all of the medical steps happened correctly, perfectly, on time, and all that?
> A. Yes. You would have to get a surgical crew there. I don't know if it's possible, the size of the hospital. I practiced in a small town, so they would have to round up everybody to do the surgery, to begin with. You would have to get an anesthesiologist there. It would take a little bit of time, maybe as much as an hour or two, just to get him prepped for surgery. And not only that, my suspicion would be that he would be very hypertensive and they would probably not even take him into surgery to begin with because he would have been such a poor surgical candidate that they would try to resuscitate him with fluids and antibiotics and so forth and delay the surgery because they don't want him dying on the operating table.

(Bates Dep. 56:7-58:6.)

The distinction in required expertise is, in part, because there is a different standard of care for doctors in non-emergency situations compared to emergency situations. According to O.C.G.A. § 51-1-29.5(c):

> In an action involving a health care liability claim arising out of the provision of emergency medical care in a hospital emergency department or obstetrical unit or in a surgical suite immediately following the evaluation or treatment of a patient in a hospital emergency department, no physician or health care provider shall be held liable unless it is proven by clear and convincing evidence that the physician or health care provider's actions showed gross negligence.

Courts in the Eleventh Circuit routinely exclude the expert testimony of physicians where they offer opinions in areas for which they have insufficient

Page **10** of **20**

knowledge, experience, or training. *See e.g. Everett v. Georgia-Pacific Corp.*, 949 F. Supp. 856, 857 (S.D. Ga. 1996) (finding a physician was not competent to testify as to the cause of the plaintiff's medical condition because the physician practiced in area of family medicine and surgery and possessed no specialized knowledge or training in field of toxicology, and an expert must, at a minimum, possess some specialized knowledge about field in which he is to testify); *Jenkins v. Corizon Health Inc.*, CV418-099, 2020 WL 7330533, at *4–5 (S.D. Ga. Aug. 5, 2020) (finding that a physician who was the president of a hospital medical staff and was experienced in internal medicine was not qualified to testify as to medical care related to the hospital's post-anesthesia care unit and hospital laboratory).  In the present matter, Dr. Bates admittedly is unqualified as an expert in emergency care.

In addition to being unqualified to testify as to emergency medicine, Dr. Bates is also not qualified to give expert testimony as to the probability of survival of a bowel surgery by patients, generally, or Mr. Minton, specifically.  Dr. Bates' CV and deposition testimony are both silent as to any relevant training or experience in the area of probability of survival of medical procedures in general, much less the specific survivability of Mr. Minton from the specific surgery he needed to save his life.

An expert is required to give an opinion based off scientific, technical, or specialized knowledge that is not based on assumptions or speculations.  *See* F.R.E.

702(a).  "A witness's qualifications must correspond to the subject matter of his or her proffered testimony. . . In other words, a witness qualified as an expert in one subject may not offer expert testimony on another subject." *Allmond v. Akal Sec., Inc.*, No. CIVA 4:05CV96 HL, 2007 WL 988757, at *2 (M.D. Ga. Mar. 29, 2007).  This is because "[e]xpertise in one field does not qualify a witness to testify about others." *Lebron v. Sec'y of Fla. Dep't of Children & Families*, 772 F.3d 1352, 1368–69 (11th Cir. 2014).  Because Dr. Bates is admittedly only an expert in the area of correctional medicine, he is not qualified to testify as to the probability of survival of Mr. Minton after a bowel surgery.  Therefore, Dr. Bates' fifth opinion should be excluded.

    **3.**    **Dr. Bates' conclusion about Mr. Minton's survivability is not reliable.**

Not only is Dr. Bates not qualified to testify regarding Mr. Minton's salvageability, but the opinion itself is unreliable and inadmissible.  He is unable to describe the point at which Mr. Minton's health deteriorated past the point of saving him within any reasonable degree of medical certainty.  Dr. Bates attests to this fact many times in his testimony:

> Q. What was the last point in time that Mr. Minton was salvageable?
> A. I can't say that. I really don't know.

(Bates Dep. 86:24-87:2.)

> Q. Do you think that there's any way for Dr. Lutz to know that, that there's enough information for him to know that Mr. Minton was salvageable as of 9:15 or 10 p.m.?
> A. It's anybody's guess as to whether Mr. Minton was salvageable at any point in the period of time…I don't know exactly when that occurred.

(Bates Dep. 64:22-65:8.)

> Q. So during this time at the Baldwin County Jail, is it your opinion that Mr. Minton was never salvageable?
> A. I wouldn't say that he was never salvageable. I would just say that he was in – towards the end there, certainly by the 28th, I think it would have been very unlikely that he would have survived.

(Bates Dep. 81:14-21.)

Multiple times in his testimony, Dr. Bates mentions that not only did he not know when Mr. Minton was salvageable, but that it would be nearly impossible to know but then states with absolution that, despite all this uncertainty, Mr. Minton was not salvageable at a certain date. (Bates Dep. 64:22-65:8, 81:14-21, 86:24-87:2.) This type of expert testimony, that is vague, speculative, and without a reasonable degree of medical certainty, is the exact type of testimony that would cause confusion with the jury and should be excluded.

In order to be reliable, expert testimony must be supported by scientific knowledge. *Daubert*, 509 U.S. at 590. "[T]he word 'knowledge' connotes more than subjective belief or unsupported speculation." *Leathers v. Pfizer, Inc.*, 233 F.R.D. 687, 692 (N.D. Ga. 2006) (quoting *Daubert*, 509 U.S. at 590). "[N]othing in either

*Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Cooper v. Marten Transp., Ltd.*, 539 Fed. Appx. 963, 966 (11th Cir. 2013) (quotation and citation omitted). Expert testimony that fails to conform to the facts does not help the trier of fact. *McKee v. United States*, 2014 WL 11460475, at *4 (N.D. Ga.2014), aff'd, 597 F. App'x 625 (11th Cir. 2015). Moreover, when medical causation is at issue, parties must prove causation to a reasonable degree of medical certainty. *Siharath*, *supra*. Dr. Bates' testimony regarding the survivability of Mr. Minton is mere *ipse dixit* and falls far short of the reasonable degree of certainty required for testimony regarding causation.

Because his testimony regarding survivability of a bowel surgery is unreliable *ipse dixit* that, nonetheless, still falls short of establishing a reasonable degree of medical certainty, Dr. Bates' fifth opinion should be excluded.

**C.    Dr. Bates' Sixth Opinion Should be Excluded.**

**1.    Dr. Bates' Sixth Opinion.**

Dr. Bates' sixth opinion is: "The use of methamphetamines, especially IV use, has been associated with an increased risk of multiple co-morbidities and a marked decrease in life expectancy." (Ex. G, p.3.) He further stated in his deposition:

> Q. Okay. Based on all of these facts about Mr. Minton and the condition of his body, what would you expect the impact on his life expectancy to be?
> A. It would be significantly shortened.
> Q. Okay. He was a 40-year-old or roughly 40-year-old man when he passed. How much shorter do you think his life would have been due to his - the condition of his body?
> A. If he continued with the substance abuse, he wouldn't have hit 50.

(Bates Dep. 68:23-69:8.)

> Q. Supposing, hypothetically, that Mr. Minton had gotten surgery and had survived. Would there be long-term effects on his quality or quantity of life?
> A. Yes.
> Q. What would those be?
> A. Well, one thing, he probably would have ended up with, like I said, an ileostomy or a colostomy. Because he's got peritonitis, they're going to be reluctant to reanastomose those two ends together. So he's going to end up with some kind of bag on his abdomen. And he's going to develop more adhesions from the infection that he's got in his belly. He's already prone to developing adhesions, so he is going to end up a mess.
> Q. Would you expect his life expectancy to be decreased due to this incident?
> A. Yes. And not only this incident but the fact that he was a methamphetamine user.

(Bates Dep. 65:18-66:12.)

**2. Dr. Bates is not qualified to testify about Mr. Minton's life expectancy.**

Dr. Bates does not have the expertise to make predictions regarding Mr. Minton's life expectancy, which is wildly speculative and without any reasonable

degree of medical certainty.  Though his CV reflects some experience and training in addiction medicine, it is silent as to any qualifications as to determining life expectancies.  (*See generally* Ex. G.)  An expert may be qualified to testify due to his knowledge, skill, experience, training, or education. *Trilink Saw Chain, LLC v. Blount, Inc.*, 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008).  Due to the entire lack of qualification as to determining life expectancy, generally, much less the life expectancy of someone needing bowel surgery like Mr. Minton, Dr. Bates is unqualified to opine on the subject, and therefore his sixth opinion should be excluded

### 3. Dr. Bates' testimony about life expectancy is unsupported *ipse dixit*.

Even if Dr. Bates *was* qualified to testify – broadly – that habitual drug users generally have decreased life spans, he has neither the particularized expertise nor the particular factual basis with which to evaluate Mr. Minton's previous drug use and then testify as to its affect on his life expectancy with any particularity or specificity.  In addition to questioning an expert's qualifications, the Court must also consider if the methodology by which the expert reaches his conclusions is sufficiently reliable – commonly called the "reliability" requirement. *Quiet Tech* at 1340.  In sum, courts have recognized "over and over that an expert's *ipse dixit* is inadmissible.  An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Wendler & Ezra, P.C. v. American Int'l Group*, 521

F.3d 790, 791 (7th Cir. 2008) (citations and quotation omitted); *see also General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert").

His deposition testimony reveals that Dr. Bates was aware of Mr. Minton's prior cigarette, alcohol, and drug usage, and had reviewed his autopsy report. (Bates Dep. 67:17-68:21.) Based on this information, Dr. Bates then opined that Mr. Minton's life expectancy would be "significantly shortened." (Bates Dep. 69:2.) When pressed on the issue, Dr. Bates stated that the drug and alcohol use would have killed Mr. Minton before age 50. (Bates Dep. 69:7-15.) However, when asked about the specifics of the potential for Mr. Minton to experience liver failure, Dr. Bates admits he "can't really say how far along [Minton] was in that process." (Bates Dep. 70:1-5.) Furthermore, his testimony shows that Dr. Bates relied on conclusory assumptions about future substance about by Mr. Minton, presumably after his release from incarceration:

> And the continued use of methamphetamines was going to weaken his heart further, probably leading to him dying at some point. Plus, you run the risk of ODing, with the number of methamphetamine overdoses I have seen lately. And, you know, the chances are -- unfortunately, with methamphetamines, we don't really see people coming off of them.

(Bates Dep. 70:8-15.) The most specific Dr. Bates gets is describing the risk of Minton "probably" dying from heart failure due to a hypothetical relapse or "the risk of ODing," again, presuming that Mr. Minton relapses. (Bates Dep. 70:8-15.) This is the sort of speculative *ipse dixit* that *Daubert* was intended to exclude.

Courts in the Eleventh Circuit have excluded testimony about life expectancy when they are based on insufficient facts and data. For instance, the Southern District of Florida excluded an expert's opinion on life expectancy where an expert relied on vague information:

> Dr. Myerburg falls far short of these requirements because it is entirely unclear how the depositions of other lay witnesses, vague records from Jackson Memorial Hospital, and life expectancy tables support an opinion that a woman of Mrs. Noon's age and medical condition could have lived another 25 years.

*Noon v. Carnival Corp.*, 18-23181-CIV, 2019 WL 5784689, at *5 (S.D. Fla. Nov. 6, 2019). On the other hand, the Northern District of Georgia held that expert testimony as to life expectancy as a part of a "differential diagnosis methodology" is "accepted under the *Daubert* standard." *Morgan v. Emeritus Corp.*, 1:09-CV-1292-CAP, 2011 WL 13175078 at *3 (N.D. Ga. Jan. 19, 2011).

In the present matter, Dr. Bates' analysis was even less robust that than both *Noon* and *Morgan*: there is no life expectancy table noted, no differential diagnosis methodology, and no other factual underpinning for that Mr. Minton would die before age 50. Most laypeople are aware, broadly, that substance use is harmful to

one's health, making that broad premise, without more specifics, an improper topic of expert testimony. Without further explanation or reliable analysis, Dr. Bates' *ipse dixit* proclamation about Mr. Minton's life expectancy, specifically, is also not admissible.

The Eleventh Circuit Court of Appeals has held that this type of opinion testimony should be excluded:

> While there are instances in which a district court may determine the reliability prong under Daubert based primarily upon an expert's experience and general knowledge in the field ... at all times the district court must still determine the reliability of the opinion, not merely the qualifications of the expert who offers it.

*Cooper*, 539 Fed. Appx. 963, 965 (quotation and citation omitted). In *Cooper*, the Eleventh Circuit Court of Appeals affirmed the exclusion of a doctor's testimony where the doctor,

> …admitted that in arriving at his opinion he did not conduct any testing. Dr. Hutton's methodology was not reliable because it was not derived from the scientific method; rather, it amounted to asking the district court simply to "tak[e] the expert's word for it." *See Hendrix*, 609 F.3d at 1201 (quotation omitted). As we have repeatedly cautioned, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.* (quotations and brackets omitted).

*Id.* at 966. In the present matter, Dr. Bates conducted no scientific analysis of the facts specific to this case – no tables, no scholarly study, no *Daubert*-appropriate

methodology. Instead, he simply asks the Court to "take his word for it." A conclusory statement as to the life expectancy of Mr. Minton requires a foundation in facts which is clearly not present in Dr. Bates' report and deposition testimony, and therefore his fifth opinion should be excluded.

## CONCLUSION

Dr. Bates's expert testimony does not meet the exacting standards imposed by Rule 702 and *Daubert*. He admits in his deposition testimony, that he is not qualified as an expert in the area of emergency medicine and concedes that his opinions on salvageability and life expectancy cannot be stated with any degree of medical certainty, which is a threshold requirement in Georgia. In addition, his fifth and sixth opinions contain inadmissible *ipse dixit* testimony which is not supported by a factual basis. Accordingly, Plaintiffs respectfully request that the Court exercise its gatekeeping function and exclude Dr. Bates's fifth and sixth opinions.

Respectfully submitted this 27th day of October, 2021.

| | |
|---|---|
| | ISENBERG & HEWITT, P.C. |
| | */s/ Melvin L Hewitt* |
| 600 Embassy Row, Suite 150 | Melvin L. Hewitt |
| Atlanta GA 30328 | Georgia Bar No. 350319 |
| (770) 351-4400 | Hilary W. Hunter |
| mel@isenberg-hewitt.com | Georgia Bar No. 742696 |
| hilary@isenberg-hewitt.com | |
| | BULLMAN LAW GROUP, LLC |
| 600 Embassy Row, Suite 150 | */s/ Mark B. Bullman* |
| Atlanta, GA 30328 | Mark B. Bullman |
| (770) 563-9300 | Georgia Bar No. 094376 |
| mbb@bullmanlawgroup.com | |