**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **STEPHANIE MINTON,** | |
| *Plaintiff,* | **CIVIL ACTION NO.** |
| **v.** | **5:20-cv-00102-TES** |
| **WILLIAM BRADLEY,** *et al.,* | |
| *Defendants.* | |

**ORDER**

Plaintiff, Stephanie Minton, brings a number of claims against Defendants Dr. Paul Buczynsky and CorrCare, Inc. ("CorrCare") on behalf of her late husband William Jeffrey Minton. Specifically, Plaintiff brings a deliberate indifference claim pursuant to 42 U.S.C. § 1983 and a state law claim of medical negligence against Dr. Buczynsky, and a state law claim of respondeat superior liability against CorrCare for Dr. Buczynsky's alleged medical negligence. Complaint & Demand for Jury Trial, Minton v. Bradley, *et al.*, No. 5:20-cv-00298-TES (M.D. Ga. July 23, 2020), ECF No. 1, ¶¶ 119–32.[1] Now that

---

[1] Before we begin, the Court needs to clear up a couple of procedural matters. First, Plaintiff initially brought the claims against Defendants Buczynsky and CorrCare in a parallel case, 5:20-cv-00298-TES, which the Court later consolidated into this case. *See* [Doc. 15]. Next, Bridgette Minton, the decedent's daughter, originally brought the case; but, after learning that Mr. Minton was married, the Plaintiff filed a Consent Motion to Substitute [Doc. 26] Stephanie Minton, the rightful holder of the wrongful death claim. The Court granted this motion on October 6, 2020. [Doc. 27]. And finally, because Plaintiff previously settled her claims against the other Defendants, these motions necessarily only deal with Dr. Buczynsky and his company, CorrCare.

discovery is over, Plaintiff moves to exclude two opinions of Defendant's expert, Dr.

Johnny Edward Bates [Doc. 43] and Defendants move for summary judgment [Doc. 56].

Having reviewed the evidence presented by the parties and their respective arguments,

the Court **GRANTS in part** and **DENIES in part** Plaintiff's Motion in Limine and

**DENIES** Defendants' Motion for Summary Judgment. Bottom line, a jury will have to

decide if Defendants did anything wrong.

## FACTUAL BACKGROUND[2]

Plaintiff, Stephanie Minton, brings this action on behalf of her late husband,

William Jeffrey Minton. [Doc. 27]. On January 25, 2018, Mr. Minton pled guilty to the

sale and possession of methamphetamine and received a sentence of ten years in prison,

with the first three to be served in confinement. But, if he successfully completed a drug

court program, the sentencing court agreed to suspend the confinement portion. [Doc.

53-1, pp. 93–102]; [Doc. 61-2, ¶ 1]. On March 28, 2018, Mr. Minton visited the WellStar

Spalding Regional Hospital emergency room complaining of abdominal pain, nausea,

and emesis.[3] Doctors diagnosed him with a small bowel obstruction and performed

---

[2] Plaintiff filed a document entitled "Plaintiffs' [sic] Statement of Additional Material Facts to Which There Exists a Genuine Dispute for Trial." [Doc. 61-3]. While the Northern District of Georgia requires the nonmovant to file such a document, *see* LR 56.1(B)(2)(b), NDGa, this Court's Local Rules only permit "[t]he movant for summary judgment" to attach a statement of material facts. LR 56, MDGa. In the Middle District of Georgia, the nonmovant may only respond to each of the movant's material facts and, where appropriate, contend "there exists a genuine dispute to be tried." *Id.* Despite the difference in local rules, the Court considered the document and the evidence included as exhibits.

[3] "Emesis" is just the fancy medical word for vomiting. *See* [Doc. 43-3, Eubanks Depo., p. 136:13–17].

surgery to remove a portion of his colon. Exhibit H-Autopsy, Minton v. Bradley, *et al.*, No. 5:20-cv-00298-TES (M.D. Ga. July 23, 2020), ECF No. 1-8, p. 1; [Doc. 61-2, ¶ 2]. Six weeks later, officers arrested Mr. Minton for purchase, possession, manufacture, distribution of marijuana and possession with intent to distribute methamphetamine and booked him into the Baldwin County Jail. [Doc. 53-2, p. 2]; [Doc. 61-2, ¶ 3].

Dr. Paul Buczynsky, a medical doctor, solely owns CorrCare and works as one of its providers. [Doc. 43-2, Buczynsky Depo., pp. 9:16–18; 23:14–19]. CorrCare provides medical services to inmates at the Baldwin County Jail pursuant to a contract ("the Medical Contract") between it and Baldwin County. [Doc. 56-4]; [Doc. 61-2, ¶ 4]. The Medical Contract required a CorrCare Provider to be physically present at Baldwin County Jail for at least "2 days per week, and at such other times as needed." [Doc. 56-4, p. 2]. Dr. Buczynsky testified that he generally would visit the jail on Tuesdays and Nurse Estes, a nurse practitioner and CorrCare provider, would visit the jail on Thursdays. [Doc. 43-2, Buczynsky Depo., pp. 23:10–22; 25:10–20]. In addition to the physical visits to the jail, the Medical Contract obligates CorrCare to maintain on-call availability 24 hours per day, 7 days per week, to include "consulting via telephone, physically being present at jail, and/or transferring the inmate to a hospital Emergency Department, as determined by the sole, sound medical judgment of CorrCare's Provider." [Doc. 56-4, p. 2]; [Doc. 43-2, Buczynsky Depo., pp. 30:21–22; 149:17–20].

Separate from the CorrCare Providers, Baldwin County employs its own nursing staff who provide medical care to inmates at the jail. [Doc. 43-3, Eubanks Depo., pp. 10:23—11:3]. These nurses staff the jail from 7:00 am to 7:00 pm Monday through Friday. [*Id.* at pp. 23:24—24:10]. On weekends, Baldwin County reduces the number of hours nurses staff the jail and requires someone to be at the jail from approximately 7:00 am until 11:00 am and then from 3:00 pm until 7:00 pm. [*Id.* at p. 24:12–20]. Baldwin County Jail policy requires medical staff to check on inmates in medical isolation at least every 30 minutes. [*Id.* at pp. 26:21—27:7]. Katherine Eubanks, a registered nurse employed by Baldwin County, works at the jail and serves as the immediate supervisor to the various Licensed Practical Nurses who work at the jail. [*Id.* at pp. 6:4–5; 11:20–25].

On May 8, 2018, the day after Mr. Minton arrived at the Baldwin County Jail, Nurse Eubanks saw Mr. Minton and filled out his intake Health Assessment form. [Doc. 56-3, pp. 1–2]; [Doc. 43-3, Eubanks Depo., pp. 43:16—44:2]. During this initial health assessment, Mr. Minton informed Nurse Eubanks that he had surgery for a partial bowel obstruction prior to his arrest. [Doc. 43-3, Eubanks Depo., p. 48:9–17]. He also told Nurse Eubanks that he had a normal bowel movement the day before and had a good appetite, and Nurse Eubanks noted she heard active bowel sounds during her exam.  [*Id.* at p. 51:7–19]; [Doc. 56-3, p. 2].  The following week, Dr. Buczynsky evaluated Mr. Minton; during his evaluation, Mr. Minton told Dr. Buczynsky that he had abdominal surgery in March for a "blockage." [Doc. 43-2, Buczynsky Depo., pp.

156:5—157:14]. Dr. Buczynsky reviewed Mr. Minton's medical records and noted that he had no complaints of nausea, diarrhea, constipation, or vomiting since the surgery—indicating a good recovery—and encouraged mild exercise moving forward. [*Id.*]; [Doc. 56-3, p. 10].

On May 25, 2018, Mr. Minton submitted a Confidential Inmate Medical Request Form complaining of "hurting and swelling in left side [of his] stomach" and "feeling sick to [his] stomach." [Doc. 56-3, p. 5]. On the same day, Nurse Eubanks evaluated Mr. Minton and recorded that he told her that his abdominal pain was severe and he had not experienced a bowel movement since the day before. [Doc. 43-3, Eubanks Depo., pp. 99:18—100:21]; [Doc. 56-3, p. 5]. Following this sick call, Nurse Eubanks referred Mr. Minton to the local emergency department for further evaluation. [Doc. 43-3, Eubanks Depo., pp. 99:25—100:2]; [Doc. 56-3, p. 5]. After returning to the jail from the ER, Dr. Buczynsky evaluated Mr. Minton and found that he appeared comfortable and well hydrated but that he had a mild area of protuberance mid-right and left abdomen. [Doc. 43-2, Buczynsky Depo., pp. 154:4—155:4].

On June 25, 2018, Mr. Minton submitted another confidential intake form requesting medical attention and complaining of stomach pain and asserting that he thought he had a hernia. [Doc. 56-3, p. 7]. Dr. Buczynsky evaluated Mr. Minton the next day and noted that Mr. Minton didn't complain of any nausea, vomiting, or bowel problems, and appeared comfortable and well-hydrated. [Doc. 43-2, pp. 155:15—156:3];

[Doc. 56-3, p. 7]. During the examination, Dr. Buczynsky found that Mr. Minton had no active bowel sounds and discovered a ventral hernia and recommended a follow up with a general surgeon upon release. [Doc. 56-3, p. 7]. Mr. Minton weighed 182 pounds during this check-up. [*Id.*]. Less than a week later, Mr. Minton submitted another intake form requesting to be transferred to the bullpen[4] because of his hernia. [*Id.* at p. 8]. Medical personnel responded that the bullpen didn't have any availability and he should take advantage of his bottom bunk profile. [*Id.*]. Dr. Buczynsky clearly knew of the response because he signed the form. [*Id.*].

Almost a month later, July 20th, Nurse Bell—an LPN employed by Baldwin County—referred Mr. Minton to the local emergency department after he complained of severe abdominal pain and jail personnel saw him vomit twice. [Doc. 43-4, Bell Depo., pp. 94:23—95:6]; [Doc. 56-3, pp. 9, 83]. That afternoon, Mr. Minton left the jail to visit the local emergency department—his second trip since the start of his incarceration. [Doc. 56-3, p. 31]. At the ER, providers performed CT scans and discovered a new shallow umbilical hernia that they hadn't discovered during his first trip. [*Id.* at pp. 88–89]. Mr. Minton weighed 181 pounds. [*Id.* at p. 86]. The emergency department discharged Mr. Minton with instructions to follow up with his primary care physician and to return to the emergency department with any worsening condition or

---

[4] Baldwin County Jail personnel refer to the area of the jail that houses inmates in protective custody or needing assistance for basic tasks as the "bullpen," and it is distinct from the medical isolation cells. *See* [Doc. 43-3, Eubanks Depo., p. 106:2–17].

concern. [*Id.* at p. 90]. Mr. Minton returned from the hospital to one of the jail's medical

isolation cells after about five hours. [*Id.* at 31].

Around midnight on July 21, 2018, Deputy Bradley—one of the jailers who

worked at Baldwin County Jail—witnessed Mr. Minton vomit in his cell. [Doc. 56-3, p.

32]; [Doc. 43-5, Bradley Depo., p. 103:2–19]. This prompted Deputy Bradley to call Dr.

Buczynsky so he could talk with Mr. Minton. [Doc. 56-3, p. 32]; [Doc. 43-5, Bradley

Depo., p. 103:2–19]. Dr. Buczynsky instructed Deputy Bradley to give Mr. Minton 8mg

of Zofran, a nausea medication, and to continue monitoring him. [Doc. 43-2, Buczynsky

Depo., pp. 86:7—87:4]; [Doc. 56-3, pp. 30, 32]. Deputy Bradley called Dr. Buczynsky

back less than an hour later and told him that Mr. Minton was still feeling ill but was

vomiting less than before. [Doc. 56-3, p. 29]. Dr. Buczynsky told Deputy Bradley to

simply continue to monitor him and gave no other orders. [*Id.*]. At 9:15 am, Mr. Minton

left his cell for a medical check and Dr. Buczynsky ordered nursing personnel to

administer 30cc of milk of magnesia to Mr. Minton, and to place him on a liquid diet for

three days and continue monitoring his condition. [*Id.* at p. 4]. During this morning

check-up, Mr. Minton weighed 175 pounds, six pounds less than the previous day.

[Doc. 56-3, p. 4]. The next day, jail personnel again witnessed Mr. Minton vomit in his

medical isolation cell. [*Id.* at p. 35].

Two days later, July 24th, Dr. Buczynsky personally examined Mr. Minton in

person for the last time. [Doc. 43-2, Buczynsky Depo., pp. 123:7—124:19]; [Doc. 56-3, p.

4]; [Doc. 61-2, ¶ 9]. During his examination, Mr. Minton told Dr. Buczynsky that he had severe abdominal pain the previous week, vomited the previous night and the morning of his exam, had not had a bowel movement for three days, and had abdominal cramping, but acknowledged that he otherwise felt better during his exam. [Doc. 43-2, Buczynsky Depo., p. 123:10–20]; [Doc. 56-3, p. 4]. As part of his assessment, Dr. Buczynsky found that Mr. Minton had mildly diminished bowel sounds, a ventral hernia, no McBurney's tenderness, and no guarding. [Doc. 43-2, Buczynsky Depo., p. 124:3–10]. Following this examination, Dr. Buczynsky prescribed Mr. Minton 20mg of Prilosec per day, 100mg of Colace per day for five days, and 25mg of Vistaril twice a day and ordered him to stay on a liquid diet for two days. [*Id.* at p. 124:11–19]; [Doc. 56-3, p. 4]. Prilosec treats acid reflux, Colace softens stool, and Vistaril helps anxiety unrelated to Mr. Minton's abdominal complaints. [Doc. 43-2, Buczynsky Depo., p. 125:21—126:11]. Mr. Minton weighed 167 pounds during his last check-up with Dr. Buczynsky—a loss of 14 pounds in four days. [Doc. 56-3, p. 4].

Mr. Minton left medical isolation and returned to the general population on July 25, 2018. [*Id.* at p. 47]. Other general population inmates testified that they witnessed Mr. Minton pass out and vomit a substance that resembled dark blood or fecal matter. [Doc. 61-5, Butts Depo., p. 24:20–23]; [Doc. 61-6, Lewis Aff., ¶¶ 6, 7]. Jail officials returned Mr. Minton to medical isolation on July 27, 2018, just two days later. [Doc. 56-3, p. 49]. At 10:20 am, Nurse Eubanks and Dr. Buczynsky talked over the phone about

Mr. Minton's status and Dr. Buczynsky ordered that Mr. Minton should return to a liquid diet for five days and remain under monitor every 30 minutes. [Doc. 43-3, Eubanks Depo., pp. 132:22—133:11]; [Doc. 56-3, p. 3]. During his morning check-up, Mr. Minton's blood pressure was 100/57 and he weighed 167 pounds. [Doc. 56-3, p. 3].

At approximately 1:30 pm that day, Mr. Minton told a deputy that he had thrown up in his cell. [*Id.* at p. 50]. Following this report, Nurse Eubanks saw Mr. Minton about 90 minutes later. [Doc. 43-3, Eubanks Depo., pp. 136:4—137:22]; [Doc. 56-3, p. 50]. During this check-up, Mr. Minton reported to Nurse Eubanks that he had thrown up and that he needed something for nausea and requested ice. [Doc. 56-3, p. 3]. Nurse Eubanks recorded in Mr. Minton's progress notes that the yellowish liquid on his cell floor did not look like vomit and confirmed that the kitchen had served chicken broth and red punch for lunch. [Doc. 43-3, Eubanks Depo., pp. 136:10—137:3]; [Doc. 56-3, p. 3]. Despite his reports of vomiting, Nurse Eubanks noted that Mr. Minton didn't complain of pain, had warm and dry skin with good turgor, and his skin color was not pale or cyanotic. [Doc. 43-3, Eubanks Depo., pp. 136:22—137:9]; [Doc. 56-3, p. 3]. At this time, Mr. Minton had a recorded blood pressure of 100/62. [Doc. 56-3, p. 3]. Nurse Eubanks called Dr. Buczynsky again to discuss Mr. Minton's status. [Doc. 43-3, Eubanks Depo., p. 137:10–14]; [Doc. 56-3, p. 3]. The parties dispute whether Dr. Buczynsky issued any new orders at the time or told Nurse Eubanks to continue monitoring Mr. Minton pursuant to the orders he gave that morning. [Doc. 61-2, ¶ 12]. Regardless, medical staff

did not change Mr. Minton's care plan and continued to monitor him in medical

isolation and kept him on a liquid diet. *See* [Doc. 56-3, pp. 3, 50–51]. No one called Dr.

Buczynsky following his afternoon phone call with Nurse Eubanks.

During a routine cell check, Deputy Bradley found Mr. Minton unresponsive,

naked, and in an unusual position on the floor at 12:23 am, the next day, July 28, 2018.

[Doc. 43-5, Bradley Depo., p. 135:7–21]; [Doc. 56-3, p. 51]. Deputy Bradley testified that

he entered the cell to check on Mr. Minton, found that he had a faint pulse and then

called for other officers for assistance to attempt CPR. [Doc. 43-5, Bradley Depo., 135:7–

21]. Deputy Bradley called EMS to alert them to the situation and they arrived at the jail

approximately eight minutes later. [Doc. 43-5, Bradley Depo., p. 153:2–5]; [Doc. 56-3, p.

51]. When EMS personnel arrived at the jail, they reported that Mr. Minton had already

died, and they made no resuscitation efforts. Exhibit F – Grady EMS Report, Minton v.

Bradley, *et al.*, No. 5:20-cv-00298-TES (M.D. Ga. July 23, 2020), ECF No. 1-7. EMS

personnel also noted that Mr. Minton's body had dependent lividity, a discoloration of

the body due to the pooling of blood, which indicated that he had likely been dead for

at least an hour. [Doc. 43-9, Bates Depo., p. 53:3–20]; [Doc. 53-5, Lutz Depo., pp. 106:24—

109:14].

Following Mr. Minton's death, Baldwin County Jail personnel notified the

Georgia Bureau of Investigation ("GBI") who then sent investigators to the jail. [Doc. 43-

5, Bradley Depo., p. 153:11–19]. The GBI investigators established an investigation scene

and interviewed jail personnel. [*Id*.]. The GBI's autopsy report determined that Mr. Minton "died as a result of peritonitis, due to small bowel perforation, due to small bowel obstruction by fibrotic band, due to right hemicolectomy for probable cecal bascule." [Doc. 56-3, p. 172].

At the expense of repeating the preceding narrative, the Court has summarized Mr. Minton's medical information in the chart below to illustrate the events most relevant to the claims at issue.

| March 28, 2018 | • Mr. Minton visits WellStar Regional Hospital emergency room complaining of abdominal pain, nausea, and vomiting.<br>• Providers diagnose him with a small bowel obstruction, perform emergency surgery, and remove a portion of his colon. |
| --- | --- |
| May 7, 2018 | • Mr. Minton booked into Baldwin County Jail. |
| May 8, 2018 | • Mr. Minton's first evaluation by medical personnel at Baldwin County Jail.<br>• Notified Nurse Eubanks of his previous abdominal surgery.<br>• Normal bowel movement the day before, good appetite, and active bowel sounds.<br>• Mr. Minton weighed **180.5 pounds**. |
| May 15, 2018 | • Mr. Minton's first in-person evaluation by Dr. Buczynsky.<br>• Dr. Buczynsky made aware of his previous surgery.<br>• No nausea, vomiting, or bowel problems and appeared comfortable and well hydrated.<br>• Mr. Minton weighed **184 pounds**. |
| May 25, 2018 | • Mr. Minton submitted sick call slip complaining of abdominal pain and feeling sick.<br>• Nurse Eubanks evaluated Mr. Minton and referred him to the local emergency department for further evaluation.<br>• Mr. Minton weighed **182 pounds**. |
| May 29, 2018 | • Mr. Minton's second in-person evaluation by Dr. Buczynsky. |

| | |
|---|---|
| | • Found a mild area of protuberance in the mid-right and left abdomen but otherwise appeared comfortable and well hydrated. |
| June 25, 2018 | • Mr. Minton submitted sick call slip complaining of stomach pain and asserting he believed he had a hernia. |
| June 26, 2018 | • Mr. Minton's third in-person evaluation by Dr. Buczynsky.<br>• Found that Mr. Minton had a ventral hernia but otherwise wasn't sick.<br>• Recommended a follow-up with a general surgeon following his release. |
| July 2, 2018 | • Mr. Minton submitted sick call slip asking to be moved to the bullpen citing problems with his hernia.<br>• Request denied by medical staff because of lack of availability. |
| July 20, 2018 | • Jail officers witness Mr. Minton vomit twice, and he complained of severe abdominal pain.<br>• Evaluated by Nurse Bell who referred him to the local emergency department for further evaluation.<br>• **3:03 pm:** Mr. Minton leaves for emergency department.<br>• Providers perform CT scans indicating a new shallow umbilical hernia. Discharged with instructions to return if condition worsened.<br>• **8:18 pm**: returned to jail and placed in medical isolation. |
| July 21, 2018 | • **12:00 am**: Deputy Bradley sees Mr. Minton vomit in his cell.<br>• **12:18 am**: Deputy Bradley calls Dr. Buczynsky to notify him. Dr. Buczynsky and Mr. Minton talk on the phone. Mr. Minton given 8mg of Zofran, a nausea medicine.<br>• **1:16 am**: Deputy Bradley calls Dr. Buczynsky to notify him that Mr. Minton continued to vomit, but less than before. Deputy Bradley ordered to continue monitoring him.<br>• **9:15 am**: Mr. Minton checked by nursing personnel. Dr. Buczynsky ordered staff to give Mr. Minton 30 cc of milk of magnesia and to place him on a liquid diet for three days. Mr. Minton weighed **<u>175 pounds</u>**. |
| July 22, 2018 | • Jail personnel witness Mr. Minton vomiting in his cell. |
| July 24, 2018 | • Mr. Minton's fourth and last in-person evaluation by Dr. Buczynsky.<br>• Mr. Minton informed Dr. Buczynsky that he had severe abdominal pain the week before, vomited the previous night |

<table>
<tr><td></td><td>and that morning, no bowel movement for three days, had abdominal cramping, but otherwise felt good during the exam.</td></tr>
</table>

|  |  |
|---|---|
|  | and that morning, no bowel movement for three days, had abdominal cramping, but otherwise felt good during the exam.<br>• Dr. Buczynsky's assessment found that Mr. Minton had mildly diminished bowel sounds, a ventral hernia, but no other evidence of illness.<br>• Dr. Buczynsky prescribed Mr. Minton 100mg of Colace per day for five days, 20mg of Prilosec per day, and 25mg of Vistaril twice a day (unrelated anxiety medication) and ordered he remain on a liquid diet for two days.<br>• Mr. Minton weighed **<u>167 pounds</u>**. |
| **July 25, 2018** | • Mr. Minton returned to general population.<br>• Fellow inmates witness Mr. Minton vomit a dark black substance resembling blood or fecal matter. Also witness him falling. |
| **July 27, 2018** | • **6:30 am**: Mr. Minton returned to medical isolation.<br>• **10:20 am**: Nurse Eubanks evaluates Mr. Minton and notifies Dr. Buczynsky of his status. Dr. Buczynsky orders her to return Mr. Minton to a liquid diet for five days and to keep him under monitor. Mr. Minton weighed **<u>167 pounds</u>**.<br>• **1:30 pm**: Mr. Minton notifies jail personnel that he had vomited in his cell.<br>• **2:50 pm**: Nurse Eubanks re-examines Mr. Minton who told her that he had vomited in his cell. Nurse Eubanks noted in Mr. Minton's progress records that the liquid didn't resemble vomit and noted kitchen served chicken broth and red punch for lunch. Called Dr. Buczynsky updating him. No new orders at that time.<br>• **10:54 pm**: Deputy Bradley witnessed Mr. Minton sitting in his bed making noises. |
| **July 28, 2018** | • **12:23 am**: Deputy Bradley found Mr. Minton unresponsive, naked, and in an unusual position on the floor. Called EMS and attempted resuscitation.<br>• **12:31 am**: EMS arrive.<br>• **1:00 am**: Mr. Minton pronounced dead. |

Plaintiff identified Dr. Martin Lutz as a medical expert who would offer

testimony on the question of whether Dr. Buczynsky departed from the applicable

standard of care when treating Mr. Minton. Dr. Lutz is licensed to practice medicine in the state of South Carolina and has maintained an active practice as a board-certified Emergency Medicine physician for 36 years. [Doc. 61-7, p. 2]. He is currently an Attending Physician with the Greenville Health System, Co-Medical Director of the Greenville County Detention Center, and a member of the faculty of the University of South Carolina School of Medicine – Greenville. [*Id.*]; [Doc. 53-3, Lutz Depo., p. 20:14–16]. In his report, Dr. Lutz asserts that he developed opinions which he "hold[s] to a reasonable degree of medical certainty" that Dr. Buczynsky owed a duty of care to Mr. Minton, that he breached that duty of care in numerous ways, and Mr. Minton died as a result of his breach. [Doc. 61-7, pp. 10–13].

Defendants designated Dr. Johnny E. "Rusty" Bates as their medical expert to offer testimony of "the standard of care ordinarily exercised by physicians and other providers generally in the diagnosis, treatment and management of the medical care of inmates in correctional facilities." [Doc. 43-8, p. 2]. Dr. Bates is licensed to practice medicine in Alabama, Tennessee, Mississippi, and Louisiana. [*Id.* at 1]. He has continually practiced medicine for 36 years, been certified by the American Board of Internal Medicine since 1987, earned a board certification with the American Board of Preventive Medicine with a specialty in addiction Medicine in 2020, and has over 28 years' experience in correctional medicine. [*Id.*]. The National Commission on Correctional Health care certified Dr. Bates as a Correctional health Professional-

Physician. [*Id.*]. In his expert report, Dr. Bates offers six opinions relating to Dr. Buczynsky's care of Mr. Minton, and more generally opinions relating to the prognosis of Mr. Minton. [*Id.* at 2–3].

## DISCUSSION

As noted above, the Court now considers both Plaintiff's Motion In Limine [Doc. 43] and Defendants' Motion for Summary Judgment [Doc. 56]. The Court will first resolve the evidentiary question before moving onto the appropriateness of summary judgment.

### A.      **Plaintiff's Motion In Limine to Exclude Testimony**

On June 15, 2021, Defendants designated Dr. "Rusty" Bates to testify on their behalf as an expert witness. [Doc. 43-7, p. 1]. Consistent with FRCP 26, Defendants produced a copy of Dr. Bates' report and his curriculum vitae. *See generally* [Doc. 43-8]. Dr. Bates offers six opinions in his report. [*Id.* at pp. 2–3]. Plaintiff only takes issues with opinions five and six. [Doc. 43-1, p. 4]. The Court will address each, in turn.

### 1.      *Daubert* **Legal Standard**

Rule 702 of the Federal Rules of Evidence provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Rulings on the admissibility of expert testimony—like all evidentiary rulings—necessarily involve the exercise of the Court's discretion. *See Burchfield v. CSX Transp., Inc.*, 636 F.3d 1330, 1333 (11th Cir. 2011). Trial courts must act as "gatekeepers" to ensure that speculative and unreliable opinions do not reach the jury. *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 589, n.7 (1993). "This gatekeeping role, however, is not intended to supplant the adversary system or the role of the jury: vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *United States v. Ala. Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013).

Expert testimony is admissible if "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable . . . ; and (3) the testimony assists the trier of fact . . . to understand the evidence or to determine a fact in issue." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *City of Tuscaloosa v. Harcros Chems. Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). The "'burden of establishing qualification, reliability and helpfulness'" lies with the party offering the expert opinion. *McClain v. Metabolite lnt'l. Inc.*, 401 F.3d 1233, 1238 (11th Cir.2005) (quoting *Frazier*, 387 F.3d at 1260).

In assessing whether an expert's methodology is reliable, the Court generally should consider the following factors: "(1) whether the expert's theory can be and has

been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential error rate of the technique; and (4) whether the technique is generally accepted in the scientific community." *Adams v. Lab. Corp. of Am.*, 760 F.3d 1322, 1327 (11th Cir.2014) (per curiam). These factors, of course, represent a non-exhaustive list and "'do not constitute a definitive checklist or test.'" *Id*. (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)). "While those factors may help in assessing the reliability of scientific or experience-based expert testimony, the district court's 'gatekeeping inquiry must be tied to the facts of a particular case.'" *Id*. (quoting *Kumho Tire*, 526 U.S. at 150).

In its gatekeeping role, the Court must focus on the reliability of the testimony, not simply whether it fits within the narrow confines of lawyer-urged litmus tests. While "'each stage of the expert's testimony [must] be reliable, . . . each stage must [also] be evaluated practically and flexibly without bright-line exclusionary (or inclusionary) rules.'" *Frazier*, 387 F.3d at 1262 (quoting *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 155 (3d Cir.1999)). The Court's goal is to ensure that an expert "'employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id*. at 1260 (quoting *Kumho Tire*, 526 U.S. at 152). "Sometimes the specific [traditional] *Daubert* factors will aid in determining reliability; sometimes other questions may be more useful." *Id*. at 1262. Testimony that the parties plan to present to

a jury must be "'properly grounded, well-reasoned, and not speculative.'" *Id*. (quoting

Fed. R. Evid. 702 advisory comm. note (2000 amends)).

Finally, the Court must assess whether the expert testimony helps the trier of

fact. This factor turns on whether the expert testimony "concerns matters that are

beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262.

"Proffered expert testimony generally will not help the trier of fact when it offers

nothing more than what lawyers for the parties can argue in closing arguments." *Id*. at

1262–63. "Nor does expert testimony help the trier of fact if it fails to 'fit' with the facts

of the case." *Stoner v. Fye*, No. 5:15-cv-102 (CAR), 2017 WL 2434461, at *4 (M.D. Ga. June

5, 2017) (quoting *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004)). "Expert

testimony lacks 'fit' when 'a large analytical leap must be made between the facts and

the opinion.'" *Id*. (quoting *McDowell*, 392 F.3d at 1299); *see also Gen. Elec. Co. v. Joiner*, 522

U.S. 136, 146 (1997). "A court may conclude that there is simply too great an analytical

gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. "Thus, the

court may exclude otherwise reliable testimony if it does not have 'sufficient bearing on

the issue at hand to warrant a determination that it [is *helpful* to the trier of fact].' "*Fye*,

2017 WL 2434461, at *4 (quoting *Bitler v. A.O. Smith Corp*., 400 F.3d 1227, 1234 (10th Cir.

2005)). "At all times when scrutinizing the reliability and relevance of expert testimony,

a court must remain mindful of the delicate balance between its role as a gatekeeper

and the jury's role as the ultimate fact-finder." *Id.*

### 2.    Opinion 5

Plaintiff first takes issue with Dr. Bates' fifth opinion:

> To a reasonable degree of medical probability, Mr. Minton's death was not caused by any act or omission by Dr. Buczynsky; prior to July 27th Mr. Minton had been sent twice to the local emergency department with similar complaints, he had been evaluated by the emergency physician and discharged back to the jail on both occasions, and by the time his condition suddenly worsened enough for anyone to recognize a surgical emergency on the evening of July 27, 2018, it is impossible to say with any reasonable degree of confidence that Mr. Minton would have survived the emergency surgery itself.

[Doc. 43-8, pp. 2–3]. Plaintiff asserts that this opinion does not pass muster because Dr. Bates isn't qualified to give such an opinion and his opinion isn't reliable. [Doc. 43-1, pp. 8, 12].

Plaintiff primarily takes issue with the fact that this fifth opinion relates to emergency medicine and Dr. Bates is not qualified to give testimony on that subject.[5] Indeed, Plaintiff seizes on Dr. Bates own admission during his deposition that "[he] wouldn't qualify as an ER expert anymore" because "[he] [hasn't] done that [work] in quite some time." [Doc. 43-9, Bates Depo., p. 18:12–14]. Prior to this admission, Dr. Bates

---

[5] The Court isn't convinced by Plaintiff's characterization of Dr. Bates' fifth opinion as one being solely related to emergency medicine. There isn't any doubt that this opinion relates to a medical emergency as Dr. Bates discusses Mr. Minton's survivability during a hypothetical emergency surgery. [Doc. 43-8, p. 3]. However, the opinion also lends the reader another interpretation: that due to the undetectable nature of Mr. Minton's condition, that despite his repeated transfer to the local emergency department and evaluation by jail medical staff that his survivability was uncertain as of the evening of July 27, 2018, when his worsened condition was discovered. This interpretation may be characterized as relating more to his condition's general prognosis as opposed to one about emergency medicine. Nevertheless, the Court finds that Dr. Bates is qualified to give an opinion on emergency medicine.

testified that he "worked in the emergency room for probably 15 years" but now most of his cases primarily "involve inmates and jails and jail health care." [*Id.* at p. 18:8–12]. In her Motion, Plaintiff asserts that "[c]ourts in the Eleventh Circuit routinely exclude the expert testimony of physicians where they offer opinions in areas for which they have insufficient knowledge, experience, or training." [Doc. 43-1, pp. 10–11 (first citing *Everett v. Georgia-Pacific Corp.*, 949 F. Supp. 856, 857 (S.D. Ga. 1996); and then citing *Jenkins v. Corizon Health Inc.*, CV418-099, 2020 WL 7330533, at *4–5 (S.D. Ga. Aug. 5, 2020)).

While Plaintiff's statement is correct, the cases cited in her Motion are inapposite to the present case. In *Everett*, the court stated that because of the expert's "***complete absence of any*** specialized knowledge with regard to toxicology," his testimony must be excluded. *Everett*, 949 F. Supp. at 858 (emphasis added). Moreover, the court in *Jenkins* held that the expert was "not qualified under Georgia law to offer opinions on the standard of care." *Jenkins*, 2020 WL 7330533 at *5. Dr. Bates neither completely lacks specialized knowledge of emergency medicine, nor has Plaintiff moved to exclude him on state-law grounds.

Here, Dr. Bates' testimony and CV clearly reflect that he has extensive prior experience and knowledge in emergency medicine. This experience and knowledge sufficiently qualify Dr. Bates to offer an opinion on the subject. The Court acknowledges that Dr. Bates hasn't practiced emergency medicine for some time, but that doesn't

20

automatically disqualify him. Instead, his lack of **recent** experience weighs heavily on the reliability of his testimony and is best left to the crucible of cross-examination and the judgment of the jury. *See Ala. Power Co.*, 730 F.3d at 1282.

Plaintiff also contends that Dr. Bates' fifth opinion lacks reliability. Plaintiff argues that Dr. Bates' failure to identify at what point Mr. Minton was salvageable, and his opinion that it would be nearly impossible to identify such a time, presents a reliability problem. According to her, his failure to do so results in an opinion that is mere *ipse dixit*. However, Plaintiff does not attack Dr. Bates' methodology of arriving to this opinion, rather she just attacks the opinion itself. Dr. Bates asserted in his expert report that his opinions "are based on [his] background, training and experience as a physician practicing correctional medicine, as reflected in [his] attached CV, as wells [sic] as [his] review of the medical records and depositions listed above." [Doc. 43-8, p. 3]. In fact, Plaintiff's own medical expert based his opinions on an almost identical methodology. *See* [Doc. 61-7, p. 11 (asserting that he formed his opinions on the basis of his "education and experience as outlined above, and on the attached curriculum vitae, and commonly accepted peer reviewed literature regarding history and physical exam findings of patients similar to Mr. Minton, and the materials reviewed for this case as listed above.")].

As such, the Court doesn't find Plaintiff's argument persuasive and determines that Dr. Bates' methodology is sufficiently reliable. Again, Plaintiff's contention with

Dr. Bates' refusal or inability to identify a point in time where Mr. Minton was salvageable is best left to cross-examination at trial. Accordingly, the Court **DENIES** Plaintiff's motion to exclude Dr. Bates' fifth opinion.

### 3.    Opinion 6

Plaintiff also takes issue with Dr. Bates' sixth opinion: "[t]he use of methamphetamines, especially IV use, has been associated with an increased risk of multiple co-morbidities and a marked decrease in life expectancy." [Doc. 43-8, p. 3]. Plaintiff takes issue with this opinion on the same basis as Dr. Bates' fifth opinion: he is unqualified to give it, and his opinion lacked reliable methodology to sustain it. The Court disagrees with Plaintiff's contention that Dr. Bates isn't qualified to give such an opinion and that his methodology lacks reliability—but, it finds that his opinion doesn't assist the trier of fact.

As noted, experts must be qualified to give their opinions by special "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. As outlined in his expert report, Dr. Bates earned a board certification with the American Preventive Medicine with a specialty in Addiction Medicine in 2020. [Doc. 43-8, p. 1]. Further, Dr. Bates is a Fellow with the American Society of Addiction Medicine. [*Id.* at p. 5]. Moreover, Dr. Bates has given at least three presentations on the subject of substance abuse detox as it relates to correctional medicine. *See* [*Id.* at p. 7]. The Court finds that he is qualified to give an opinion on the deleterious effects of methamphetamine addiction.

Furthermore, the Court finds that Dr. Bates employed a proper methodology in arriving at his sixth opinion. As stated above, for expert testimony to be admissible the expert must use a sufficiently reliable methodology. *See Frazier*, 387 F.3d at 1260. Defendants argue that "[b]ased on his education, training and experience in the treatment of patients who abuse methamphetamines and alcohol, Dr. Bates has articulated a reasonable basis" for his sixth opinion. [Doc. 53, p. 10]. More specifically, Defendants argue that Dr. Bates reviewed "Mr. Minton's criminal history related to possession and sale of methamphetamine, the testimony of [his] wife, daughter and mother regarding [his] history [of] alcohol and drug abuse, [and] [his] medical charts and criminal records documenting a history of abuse." [*Id.* at p. 9]. The Court finds that Dr. Bates' tailored review of Mr. Minton's medical history as well as the documented history of his substance abuse, along with his extensive experience caring for individuals with similar backgrounds constitutes sufficiently reliable methodology for the basis of his opinion.

The two cases cited by Plaintiff discussing the exclusion of expert testimony related to life expectancy are inapposite and unpersuasive. First, the court in *Noon v. Carnival Corp.*, 18-23181-CIV, 2019 WL 5784689 (S.D. Fla. Nov. 6, 2019) noted that nothing in the record could have supported the proffered expert's opinion and specifically asserted that the expert did not review the decedent's medical records. ("Dr. Myerburg falls far short of these requirements because it is entirely unclear how the

depositions of other lay witnesses, vague records from Jackson Memorial Hospital, and life expectancy tables support" his opinion.). Conversely, Dr. Bates reviewed Mr. Minton's medical records, including his autopsy which contained a myriad of information related to his overall health. Second, while the court in *Morgan v. Emeritus Corp*. 1:09-CV-1292-CAP, 2011 WL 13175078 (N.D. Ga. Jan. 19, 2011) noted that differential diagnosis is an acceptable method to arrive at an opinion on life expectancy, it did not hold that it is the ***only*** means to do so. As such, the Court doesn't find Plaintiff's argument persuasive and finds that Dr. Bates' sixth opinion is reliable.

However, the Court determines that Dr. Bates' sixth opinion wouldn't assist the trier of fact, and as such should be excluded. In order for expert testimony to assist the trier of fact it must "concern[] matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262 (citing *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985)). This factor "goes primarily to relevance" because "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (quoting 3 Weinstein & Berfer ¶ 702[02], p. 702–18). The Court notes that the reasonable juror likely already understands that methamphetamine use isn't good for you and can certainly affect your health in various negative ways. Dr. Bates' very general opinion that meth use can markedly decrease your life expectancy would likely not help jurors understand the medical issue at hand.

Indeed, the general nature of Dr. Bates' sixth opinion—that methamphetamine leads to negative health risks in *everyone*—isn't directly relevant to whether Dr. Buczynsky committed malpractice or was deliberately indifferent to Mr. Minton's serious medical needs, the real questions in this case. Perhaps this sort of testimony could be potentially helpful (e.g., on the issue of damages) if it was tailored to Mr. Minton, but it's not. Without a more definite opinion as to how much Mr. Minton's particular drug use and unique history supposedly affected the length of life he had remaining, the jury doesn't need specialized expert testimony to help them with general facts. Accordingly, the Court **GRANTS** Plaintiff's motion to exclude Dr. Bates' sixth opinion because it wouldn't assist the trier of fact.

### B.   Defendants' Motion for Summary Judgment

In her Complaint, Plaintiff brings two separate claims against Defendant Paul Buczynsky—deliberate indifference under 42 U.S.C. § 1983 and medical negligence—and one claim against Defendant CorrCare—respondeat superior liability. Complaint & Demand for Jury Trial, Minton v. Bradley, *et al.*, No. 5:20-cv-00298-TES (M.D. Ga. July 23, 2020), ECF No. 1, ¶¶ 119–32. In addition to these claims, Plaintiff asks for punitive damages and attorney's fees against both Defendants. *Id.* at ¶¶ 133–135.

In their Motion for Summary Judgment, Defendants addressed the two claims brought against Dr. Buczynsky and the claims for punitive damages. Specifically, Defendants argue that the record doesn't contain any evidence that shows he acted with

deliberate indifference toward the decedent. [Doc. 56-2, p. 4]. According to Defendants, the evidence clearly shows that Dr. Buczynsky met the applicable standard of care and, accordingly, did not act with negligence. [*Id.* at p. 7]. Last, Defendants argued that the record does not support Plaintiff's claim for punitive damages. [*Id.* at p. 8]. The Court will address each contested claim in turn.

### 1. Motion for Summary Judgment Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the initial responsibility of informing the court of the basis for its motion." *Four Parcels*, 941 F.2d at 1437. The movant may cite to particular parts of materials in the record, including, "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986)); Fed. R. Civ. P. 56(c)(1)(A).[6] "When the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323). Rather, "the moving party simply may show—that is, point out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 324) (cleaned up). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

If this initial burden is satisfied, the burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or[] is not significantly probative' of a disputed fact." *Josendis*, 662 F.3d at 1315 (quoting *Anderson*, 477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Further, where a party fails to address another party's assertion of fact as required by

---

[6] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

Federal Rule of Civil Procedure 56(c), the Court may consider the fact undisputed for the purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. Succinctly put,

> [s]ummary judgment is not a time for fact-finding; that task is reserved for trial. Rather, on summary judgment, the district court must accept as fact all allegations the [nonmoving] party makes, provided they are sufficiently supported by evidence of record. So[,] when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible. Indeed, if "the only issue is one of credibility," the issue is factual, and a court cannot grant summary judgment.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (internal citations omitted).

Stated differently, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "The evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. And "if a reasonable jury could make more than one inference from the facts, and one of those permissible inferences creates a genuine issue of material fact, a court cannot grant summary judgment"; it "must hold a trial to get to the bottom of the matter." *Sconiers*, 946 F.3d at 1263.

### 2.    Plaintiff's Deliberate Indifference Claim

Plaintiff argues that Dr. Buczynsky's conduct relating to Mr. Minton's treatment

"exhibits a total disregard to [his] constitutional right to be free from deliberate indifference to his need for medical care, founded upon the Eighth and Fourteenth Amendments to the United States Constitution."[7] Complaint & Demand for Jury Trial, Minton v. Bradley, *et al.*, No. 5:20-cv-00298-TES (M.D. Ga. July 23, 2020), ECF No. 1, ¶ 122. According to Plaintiff, this deliberate indifference directly and proximately caused Mr. Minton's wrongful death and caused him to "endure[] great pain and suffering before his death." *Id.* at ¶ 123. Defendants focus the thrust of their defense on their contention the record doesn't support that Dr. Buczynsky subjectively knew of a risk of serious harm to Mr. Minton. [Doc. 56-2, p. 6].

To survive a motion for summary judgment, a plaintiff alleging deliberate indifference to provide medical treatment in violation of the Fourteenth Amendment "must 'produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation.'" *See Goodman v. Kimbrough*, 718 F.3d 1325, 1331 (11th Cir. 2013) (quoting *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003)). "Stating a[] [Fourteenth] Amendment Claim of denial of adequate medical care requires satisfying both an objective and subjective component."

---

[7] The Eighth Amendment prohibits cruel and unusual punishment for ***prisoners*** while the Fourteenth Amendment does the same for ***pre-trial detainees***. Although inmates are governed by different constitutional amendments, the standard remains the same. *See Patel v. Lanier Cnty. Ga.*, 969 F.3d 1173, 1188 (11th Cir. 2020) (citing *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007)). Although not specified by the parties, the Court assumes Mr. Minton is a pretrial detainee because his incarceration at Baldwin County Jail related to different charges than the ones he pled guilty to in January of 2018. *See* [Doc. 53-2, p. 2]. As such, the Court will conduct its analysis under the 14th Amendment.

*Gifford v. Rathman*, No. 1:14-CV-1179-SLB-JEO, 2017 WL 4340454, at *19 (N.D. Ala. Sept. 29, 2017) (citing *Hervy v. McDonough*, No. 5:07cv58/RS/EMT, 2007 WL 1482392, at *3–4 (N.D. Fla. May 18, 2007)).

Our law doesn't provide an exhaustive list of what constitutes a "serious medical need." In accordance with Eleventh Circuit precedent, "a serious medical need is considered 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)). In both scenarios, "the medical need must be 'one that, if left unattended, 'pos[es] a substantial risk of serious harm.'" *Farrow*, 320 F.3d at 1243 (quoting *Taylor v. Adams*, 221 F.3d 1254, 1257 (11th Cir. 2000)).

With respect to the subjective element of deliberate indifference, Plaintiff must prove: (1) prison officials had subjective knowledge of the risk of serious harm; (2) prison officials disregarded that risk; and (3) prison officials' conduct is more than gross negligence. *See Goodman v. Kimbrough*, 718 F.3d 1325, 1331-32 (11th Cir. 2013) (quoting *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010)). "[A]n inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Liability will only stand against a prison official if they

"know[] of and disregard[] an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

To show that a prison official possesses such knowledge, he "must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Id.* "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842 (internal citations omitted).

"[G]rossly incompetent medical care or choice of an easier but less efficacious course of treatment can constitute deliberate indifference." *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989) (citing *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)). "Moreover, when the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) (first citing *Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir. 1989); then citing *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985)) (cleaned up).

Defendants don't contest that the evidence shows that Mr. Minton faced a substantial risk of serious harm, and they don't challenge the causation element. Indeed, considering Mr. Minton's deteriorating condition and ultimate death,

Defendants would be hard-pressed to legitimately challenge those elements. Accordingly, the Court only needs to determine whether Plaintiff has provided enough evidence that Dr. Buczynsky acted with deliberate indifference to create an issue for trial. To survive summary judgment, Plaintiff must provide some evidence from which a jury could find that Dr. Buczynsky had subjective knowledge of the risk of serious harm, that he disregarded that risk, and that his conduct constituted something more than gross negligence. *See Goodman*, 601 F.3d at 1158 (quoting *Townsend*, 601 F.3d at 1158). And, the Court finds that she has made such a sufficient showing.

Drawing all justifiable inferences on behalf Plaintiff, a reasonable jury could review the evidence and find that Dr. Buczynsky had subjective awareness that Mr. Minton faced a risk of a serious harm. Mr. Minton informed Dr. Buczynsky that he had undergone abdominal surgery six weeks prior to arriving at Baldwin County Jail. [Doc. 56-3, p. 10]; [Doc. 43-2, Buczynsky Depo., p. 156:16–19]. Further, Dr. Buczynsky testified that he felt comfortable dealing with the recovery of inmates following abdominal surgery, understood that bowel surgery can lead to complications, and agreed that bowel obstructions may be lethal or very serious. [Doc. 43-2, Buczynsky Depo., pp. 13:6–12; 15:9–15; 136:12–22]. Considering the above, Dr. Buczynsky clearly understood that Mr. Minton faced the possibility of negative consequences following his abdominal surgery.

In fairness to Dr. Buczynsky, that risk of harm didn't present itself at the beginning of Mr. Minton's incarceration. In fact, Mr. Minton appeared healthy and comfortable during his first examination by Nurse Eubanks and Dr. Buczynsky. [Doc. 56-3, pp. 1–2, 10]. The first inkling of that risk forming appeared May 25th, when Mr. Minton complained of swelling in his stomach and feeling sick. [Doc. 56-3, p. 5]. However, even after Mr. Minton returned from his first trip to the emergency department, he reported feeling well. [Doc. 43-2, Buczynsky Depo., pp. 154:4—155:4]. And despite complaints of a hernia, Mr. Minton appeared relatively healthy, if not uncomfortable due to his hernia, during most of his incarceration between May 25th and July 20th.

The events that started to unfold on July 20th and ran until his death, just over a week later, sufficiently put Dr. Buczynsky on notice that Mr. Minton faced a risk of serious harm. Starting on July 20th, Mr. Minton started vomiting with increased frequency, complained of severe abdominal pain, and returned to the emergency room following Nurse Bell's evaluation. [Doc. 56-3, pp. 9, 83]; [Doc. 43-4, Bell Depo., pp. 94:23—95:6]. The evidence offered by Plaintiff shows that Mr. Minton continued to vomit, had trouble with bowel movements, continued to experience abdominal pain, possibly threw up blood or fecal matter and possibly passed out on different occasions. [Doc. 56-3, pp. 3, 4, 29, 30, 31, 32, 35, 47, 49, 50, 51]. Dr. Buczynsky knew of Mr. Minton's medical issues that presented during this week because he evaluated him in person

once and talked with Deputy Bradley and Nurse Eubanks multiple times regarding his status. [Doc. 56-3, pp. 4, 29]; [Doc. 43-5, Bradley Depo., p. 103:2–19]; [Doc. 43-3, Eubanks Depo., pp. 132:22—133:11]. Despite knowing of Mr. Minton's worsening condition, Dr. Buczynsky kept in place his standing orders of medication and liquid diet.

The Eleventh Circuit has stated that "[c]hoosing to deliberately disregard, without any investigation or inquiry, everything [an] inmate says amounts to willful blindness" that can impart constructive knowledge onto the willfully blind party. *Goebert*, 510 F.3d at 1328. Based on the evidence Plaintiff presented and viewed in a light most favorable to her, a reasonable jury could find that Dr. Buczynsky's allegedly cursory treatment of Mr. Minton constituted willful blindness so as to impart constructive knowledge of the fact that he faced a risk of a serious harm. Because evidence exists from which a jury could find that Dr. Buczynsky knew of Mr. Minton's risk, Plaintiff satisfies the first prong of the subjective awareness element.

The Court must next determine whether Dr. Buczynsky disregarded Mr. Minton's serious risk of harm. Dr. Buczynsky undeniably provided *some* medical care to Mr. Minton during the course of his incarceration. Indeed, the Court finds that he likely provided competent, constitutionally-sufficient medical care at various points while providing Mr. Minton care. As such, the Court must tread hesitantly before finding that evidence of a constitutional violation exists. *See Paulk v. Ford*, 826 Fed. App'x 797, 806 (11th Cir. 2020) (citing *Waldrop*, 871 F.2d at 1035). However, even when inmates

34

previously received competent care, "one episode of gross conduct would be sufficient for a jury to make a finding of deliberate indifference." *Rogers*, 792 F.2d at 1062.

Despite administering some medical care to Mr. Minton, the Court finds Plaintiff provided evidence from which a reasonable jury could determine he actually disregarded that risk. Looking at the record in the light most favorable to Plaintiff, the evidence paints a picture of rapidly declining health for Mr. Minton, which became readily apparent starting July 20, 2018, and a course of little to no action by Dr. Buczynsky. Mr. Minton visited the local emergency department on July 20, 2018, a little more than a week before he died, complaining of abdominal pain and vomiting. [Doc. 43-4, Bell Depo., pp. 94:23—95:6]; [Doc. 56-3, pp. 9, 83]. After returning from the hospital—with instructions to return should his condition worsen—Mr. Minton continued to struggle with abdominal pain, lack of bowel movements, and vomiting. *See* [Doc. 43-5, Bradley Depo., p. 103:2—19]; [Doc. 56-3, pp. 4, 30, 32].

By the time Dr. Buczynsky examined Mr. Minton on July 24, he still complained of vomiting and lack of bowel movements. [Doc. 43-2, Buczynsky Depo., p. 123:10—20]; [Doc. 56-3, p. 4]. Once Mr. Minton returned to the jail's general population on July 25th, his condition quickly worsened: fellow inmates testified that he was throwing up a dark substance—either blood or fecal matter—and that he had been falling down. [Doc. 61-5, Butts Depo., p. 24:20—23]; [Doc. 61-6, Lewis Aff., ¶¶ 6, 7]. This testimony coincides with

what Mr. Minton reported to jail personnel, which prompted his return to medical isolation on the 27th.[8] [Doc. 56-3, p. 3].

Even assuming Dr. Buczynsky had not yet disregarded Mr. Minton's health problems, his actions (and inactions) on July 27th seriously call that assumption into question. That morning, Nurse Eubanks notified Dr. Buczynsky that Mr. Minton returned to medical isolation after possibly passing out. [Doc. 56-3, p. 3]. Despite later reports that he had thrown up in his cell, Mr. Minton's progress notes at 2:50 pm on July 27th reflect an understanding between Nurse Eubanks and Dr. Buczynsky that the liquid found in the cell was likely the chicken broth and red punch served at lunch. [*Id.*]. Despite believing Mr. Minton that he had vomited and passed out (a new symptom showing his weakened state), Dr. Buczynsky chose to stand by his previous order given that morning.

A reasonable jury could look at the evidence above and find that Dr. Buczynsky disregarded the fact that Mr. Minton possibly faced a life-threatening complication from his prior abdominal surgery. Mr. Minton had lost 17 pounds from his heaviest (184 pounds on May 15th) by the time Dr. Buczynsky last examined him in person (167 pounds on July 24th). He continued to vomit, struggled with having bowel movements, constantly complained of cramping, and had possibly passed out. Instead of referring

---

[8] In order to decide the question of deliberate indifference, a jury could certainly consider the 48-hour delay in moving Mr. Minton back to medical isolation.

Mr. Minton to the emergency department following the barrage of these worsening (and new) conditions, Dr. Buczynsky prescribed acid reflux medication, a stool softener, and kept Mr. Minton on a liquid diet—a diet that he had been on for at least five days prior to his death, and would have been subject to for five more days had he survived.

Furthermore, a jury could find that Nurse Eubanks and Dr. Buczynsky didn't believe that Mr. Minton had actually vomited in his medical isolation cell the day leading up to his death. Despite reporting to Nurse Eubanks that he vomited, Mr. Minton's progress notes seem to suggest that Nurse Eubanks believed that the liquid was the chicken broth and red punch served at lunch. In a light most favorable to Plaintiff, a jury could infer that Nurse Eubanks and Dr. Buczynsky chose to disregard Mr. Minton's report and believe that he spilled his lunch instead.[9] This inference suggests that Dr. Buczynsky directly disregarded Mr. Minton's risk.

Despite the possibility of surgical complications, the worsening conditions, the severe weight loss, and the continued complaints, a jury could determine that Dr. Buczynsky chose the path of least resistance and status quo. Accordingly, a jury could find that his actions evince a disregard for Mr. Minton's risk of serious harm because they were so basic, so minimal or so cursory that they really amounted to no treatment

---

[9] Indeed, Plaintiff's expert, Dr. Lutz, raised this point. *See* [Doc. 53-3, Lutz Depo., p. 159:7–13 ("I tried to justify in my mind how Mr. Minton says he vomits all over and how nurses say that it's just spilled soup. . . . That's the only—I'm trying to reconcile that in my mind.")].

at all. *See Waldrop*, 871 F.2d at 1035 (citing *Rogers*, 792 F.2d at 1058); *McElligott*, 182 F.3d at 1255 (citations omitted).

Last, the Court must decide whether Plaintiff has offered enough evidence from which a jury could find that Dr. Buczynsky's actions constituted more than gross negligence. The meaning of this element "is not self-evident." *Goebert*, 510 F.3d at 1327. In fact, the Eleventh Circuit recently stated that there is an "inconsistency" in its case law with respect to the description of "this element as exceeding gross negligence or as exceeding mere negligence." *Smith v. Wood*, 2021 WL 4452526, at *3 (11th Cir. Sept. 29, 2021). In *Smith*, the Eleventh Circuit asserted that conduct must be "the equivalent of recklessly disregarding the risk." *Id.* (quoting *Farmer*, 511 U.S. at 836, 839 (quoting Model Penal Code § 2.02(2)(c))). The Model Penal Code defines recklessness as a conscious disregard of a substantial and unjustifiable risk. Model Penal Code § 2.02(2)(c). In accordance with this definition, the Court finds that a reasonable jury could find that Dr. Buczynsky consciously disregarded Mr. Minton's risk of harm, and as a result acted with recklessness sufficient for a claim of deliberate indifference to stand.

Based on the foregoing, the Court finds that Plaintiff has provided sufficient evidence from which a reasonable jury could find that Dr. Buczynsky subjectively disregarded Mr. Minton's serious risk of medical harm so that a jury must ultimately decide the issue. By making this determination, the Court isn't deciding that Dr.

Buczynsky violated Mr. Minton's constitutional rights or that he committed medical malpractice. The Court's decision merely reflects that Plaintiff provided enough evidence to create a genuine issue of material fact. And, because a genuine issue of material fact exists, the Court cannot grant summary judgment and must hold a trial so that a jury can decide the issue. *See Sconiers*, F.3d at 1263.  As such, the Court finds that her claim of deliberate indifference to provide medical care pursuant to 42 U.S.C. § 1983 may go forward. Accordingly, the Court **DENIES** Defendants' summary judgment motion with respect to this claim.

### 3.    Plaintiff's Medical Negligence Claim

Plaintiff also brings a state law claim of medical negligence against Dr. Buczynsky alleging that he "owned [sic] Mr. Minton the standard of medical care required of physicians," that he "breached the duty of care," and finally that his breach was the direct and proximate cause of Mr. Minton's death.  Complaint & Demand for Jury Trial, Minton v. Bradley, *et al.*, No. 5:20-cv-00298-TES (M.D. Ga. July 23, 2020), ECF No. 1, ¶¶ 124, 125, 130. Specifically, Plaintiff alleges Dr. Buczynsky failed to "fully review and act appropriately as a result of the changes in and worsening of Mr. Minton's conditions." *Id.* at ¶ 128. Defendants contend that Dr. Buczynsky met the applicable standard of care and that "[t]here is no expert testimony adequate to prove that [his] care of Mr. Minton departed from the standard of care, nor that any such negligence was a proximate cause of Mr. Minton's death." [Doc. 56-2, p. 7].

Georgia law provides that "a person professing to practice . . . the administering of medicine for compensation must bring to the exercise of his profession a reasonable degree of care and skill." O.C.G.A. § 51-1-27. Further, "[a]ny injury resulting from a want of such care and skill shall be a tort for which a recovery may be had." *Id.* Georgia courts have interpreted this statute to require plaintiffs seeking recovery in a medical malpractice action to prove: "(1) the duty inherent in the doctor-patient relationship; (2) the breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure [was] the proximate cause of the injury sustained." *Zwiren v. Thompson*, 578 S.E.2d 862, 864 (Ga. 2003) (quoting *Hawkins v. Greenberg*, 304 S.E.2d 922 (Ga. Ct. App. 1983).

In such cases, Georgia law presumes that "medical services were performed in an ordinary and skillful manner[.]" *Overstreet v. Nickelsen*, 317 S.E.2d 583, 587 (Ga. Ct. App. 1984). "The proof required to rebut that presumption must come from expert medical witnesses." *Id.* Thus, in a medical malpractice action, medical expert testimony is not merely a suggestion to prove the causation prong, it is a requirement. *Zwiren*, 578 S.E.2d at 866; *see Bowling v. Foster*, 562 S.E.2d 776, 780 (Ga. Ct. App. 2002) (A "plaintiff is usually required to 'offer expert medical testimony to the effect that the defendant-doctor failed to exercise that degree of care and skill which would ordinarily have been employed by the medical profession generally *under the circumstances*.'") (citation omitted; emphasis added); *Porter v. Guill*, 681 S.E.2d 230, 235 (Ga. Ct. App. 2009) ("To

40

recover in a medical malpractice case, a plaintiff must demonstrate, by expert

testimony, a violation of the applicable medical standard of care [and] also that the

purported violation [of] or deviation from the proper standard of care is the proximate

cause of the injury sustained.").

    The reason why expert testimony is necessary in a medical malpractice action,

and not in an ordinary negligence action can be summarized as follows:

> A malpractice claim requires expert testimony because the court and the
> jury must have a standard measure which they are to use in measuring
> the acts of the professional in determining whether he exercised a
> reasonable degree of care and skill in caring out his professional duties.
> The proper standard of measurement is to be established by testimony of
> professionals; for it is a professional question.

*Roberts v. Quick Rx Drugs, Inc.*, 807 S.E.2d 476, 480 (Ga. Ct. App. 2017) (quoting

*Hopkinson v. Labovitz,28* 499 S.E.2d 338, 339 (Ga. Ct. App. 1998)); *see Wagner v. Timms*,

281 S.E.2d 295, 297 (Ga. Ct. App. 1981) ("Testimony establishing the proper medical

standard [is] required because a jury cannot reasonably be expected to apply negligence

principles to medical conduct absent competent evidence of what degree of skill and

care the medical profession generally would have exercised under similar

circumstances."). Accordingly, a plaintiff alleging professional malpractice must present

expert testimony to establish the proper medical standard of conduct.

    Plaintiff's proffered expert testimony must be based on "more than mere chance

or speculation" but does not need to use "the magic words 'reasonable degree of

medical certainty.'" *Anthony v. Chambless*, 500 S.E.2d 402, 404–05 (Ga. Ct. App. 1998)

(citing *Abdul-Majeed v. Emory Univ. Hosp.* 484 S.E.2d (Ga. Ct. App. 1997) *overruled on other grounds by Ezor v. Thompson*, 526 S.E.2d 609 (Ga. Ct. App. 1999)). This standard "has no greater meaning than a preponderance of the evidence, and the standard of proof is preponderance of the evidence as to medical causation." *Estate of Patterson v. Fulton-DeKalb Hosp. Auth.*, 505 S.E.2d 232, 234 (Ga. Ct. App. 1998).

Defendants' arguments that the evidence shows that Dr. Buczynsky met the applicable standard of care and that no expert testimony can controvert that fact simply miss the mark. Defendants focus their first argument on the fact that Dr. Lutz testified that Dr. Buczynsky met the standard of care on each of the four occasions he examined Mr. Minton in person. *See* [Doc. 56-2, p. 7]. Dr. Lutz, in fact, did testify to this effect. However, Dr. Lutz's expert report also identified numerous occasions where Dr. Buczynsky and CorrCare generally departed from the applicable standard of care and specifically departed from the applicable standard of care when treating Mr. Minton. *See* [Doc. 61-7, pp. 10–13]. Dr. Lutz asserted that he holds these opinions to a reasonable degree of medical certainty. [*Id.* at p. 10]. Indeed, the Court already determined that Plaintiff has offered enough evidence from which a jury could find that Dr. Buczynsky acted with deliberate indifference in failing to provide Mr. Minton adequate medical care—a standard that is markedly higher than required to go to trial on a simple medical negligence claim. Because the Court allowed Plaintiff's claim of deliberate

indifference to go forward, then surely it must allow her claim of medical negligence to go forward as well.

At bottom, the parties have provided two experts with differing opinions on the ultimate issue for this claim—whether Dr. Buczynsky breached the duty of care he owed Mr. Minton. Plaintiff has offered enough evidence of medical negligence to allow the jury to hear all of the evidence and decide whether she met her burden of proof. Juries exist for this exact reason—to serve as an impartial fact finder. As such, the Court finds that there is clearly a triable issue of fact suitable for a jury to decide. Accordingly, the Court **DENIES** Defendants' motion with respect to this claim and allows Plaintiff's medical negligence claim to go forward.

### 4.    Plaintiff's Claim for Punitive Damages

Plaintiff brings a claim for punitive damages against Defendants alleging their acts as "willful, wanton, malicious and so extreme and oppressive as to entitle" her to them. Complaint & Demand for Jury Trial, Minton v. Bradley, *et al.*, No. 5:20-cv-00298-TES (M.D. Ga. July 23, 2020), ECF No. 1, ¶ 133. Plaintiff did not specify in her Complaint whether she brings this claim under federal law or state law. However, Plaintiff argued in her Response that she is entitled to punitive damages under both federal and state law. Defendants argue that Plaintiff's claims for punitive damages "[are] unsupported by the evidence and should be dismissed." [Doc. 56-2, p. 8]. The

Court discusses the appropriateness of punitive damages under both federal and state law.

    *a.  Federal Law Claim*

"Generally, before an award of punitive damages is authorized in a civil rights action the jury must find, and the evidence must support its decision, that the defendant was motivated by an evil motive or intent, or **there must be reckless or callous indifference** to federally protected rights." *Anderson v. City of Atlanta*, 778 F.2d 678, 688 (11th Cir. 1985) (citing *Smith v. Wade*, 461 U.S. 30 (1983) (emphasis added)). Punitive damages are available in proper § 1983 actions. *See Smith*, 461 U.S. at 35. "It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Farmer*, 511 U.S. at 836. Because the Court previously determined that Plaintiff provided enough evidence to move forward with her claim of deliberate indifference, it also determines that she can move forward with her federal claims for punitive damages.

    *b.  State Law Claim*

Georgia law provides that "[p]unitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or **that entire want of care which would raise the presumption of conscious indifference to consequences**." O.C.G.A. § 51-12-5.1(b) (emphasis added). The Court found that Plaintiff

provided enough evidence to sustain her claim of deliberate indifference, which requires the showing that Dr. Buczynsky acted with recklessness with respect to Mr. Minton's substantial risk of serious harm. The Court finds that Georgia's punitive damages statute adequately captures such a deliberate indifference claim. As such, the Court finds that Plaintiff provided evidence to put the question of punitive damages to a jury. Accordingly, the Court **DENIES** Defendants' summary judgment motion with respect to Plaintiff's claims for punitive damages.

<u>**CONCLUSION**</u>

As detailed above, the Court **DENIES in part** and **GRANTS in part** Plaintiff's Motion in Limine [Doc. 43] by admitting Dr. Bates' fifth opinion and excluding his sixth opinion. Further, the Court **DENIES** Defendant's Motion for Summary Judgment [Doc. 56] and determines that Plaintiff can move forward on her claims against Defendants Buczynsky and CorrCare.

The Court will shortly issue an order requiring the parties to confer and present a pretrial order to the Court in preparation of this case proceeding to trial. The Court will tentatively schedule this case for trial in its August 2022 term, with a pretrial conference scheduled in July. The parties should immediately begin to secure their respective witnesses. Should the parties wish to make another attempt at mediation, they should ensure that the mediation is complete before July 15, 2022.

**SO ORDERED**, this 6th day of May, 2022.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**